## CHARLES TOWN.

### STATE v. SHEPPARD.

Decided September 7, 1901.

1. INDICTMENT—*Sufficiency in Murder.*

An indictment in the form, prescribed in section 1 of chapter 144 of the Code, is sufficient to support a conviction of murder in the first degree.   (p. 592).

2. VENUE—*Change of—Burden.*

The burden of proof is on the prisoner to show, to the satisfaction of the court, good cause to have the trial of the case removed to a county other than that in which the crime was committed, and such cause must exist at the time the application for the change of venue is made.   (p. 592).

3. CHANGE OF VENUE—*Facts Necessary.*

In order that a change of venue may be had, facts and circumstances must be shown, from which the conclusion that a fair and impartial trial cannot be had is fairly deducible; and the court must be satisfied from those facts and circumstances, and not from conclusions or opinions of the defendant or his witnesses, that such trial cannot be had.   (p. 593).

4. CRIME—*Mob Violence—Venue.*

Where it appears from the petition and affidavits that, immediately after the commission of the crime, there were rumors and talk of mob violence against the prisoner, but such rumors and talk were confined to the inhabitants of a small portion of the county, and there had been some excitement and prejudice and feeling against the prisoner immediately after the perpetration of the crime, but, at the time of the trial, there is no longer talk of such violence and the excitement, prejudice and feeling have greatly subsided and no trouble is found in obtaining a jury free from exception, the court may properly overrule a motion for a change of venue.   (p. 594).

5. MURDER—*Evidence—Res Gestae—Trial.*

Upon the trial of a person, charged with murder, evidence of acts and conversations of the accused, prior to the homicide, though not shown to be a part of the *res gestae*, is admissible when such facts legitimately tend to establish motive or intention on the part of the defendant to commit the crime with which he is charged; but such evidence is admissible for that purpose only. Such evidence is not limited to the time or place of the homicide, but will include all such acts and declarations, of any date prior to the homicide and at any place, as will serve to cast light upon the question whether the accused committed the homicide. (p. 595).

6. TRIAL—*Wife Murder—Evidence.*

In such case, it is proper to show, against a prisoner, charged with having murdered his wife, that the deceased had some property, that they had been married but a short time, that he had stated prior to the marriage that if she disposed of her property he would not have her, that he had been displeased after the marriage because of her useless expenditure of money, that he had used language after the marriage, importing that her property was one of the inducements to the marriage, and that he had stated before the homicide that he intended to get shut of her child, and, if he could not do that, he would get shut of both of them, it being shown that the child was murdered at the same time; for the purpose of showing a motive for, and an intention to commit the crime, and how much weight such facts and circumstances, taken in connection with all the other evidence in the case, are entitled to is for the determination of a fair and impartial jury, duly impressed with a sense of their responsibilities and duties. (p. 597).

7. HOMICIDE—*Declarations of Prisoner.*

In such case, it is competent to prove any actions and declarations of the prisoner, subsequent to the homicide, tending to show a lack of concern at the death of the deceased or indifference as to her fate, although such acts and declarations would not be admissible as a part of the *res gestae*, because too remote. (p. 599).

8. PRISONER—*Voluntary Acts—Evidence.*

Anything voluntarily done or said by one charged with crime, which in any way or to any extent tends to show his guilt, is competent evidence and should go to the jury, and, of its weight the jury alone can judge. (p. 600).

9. WITNESS—*Examination—Preliminary.*

It is proper to ask a witness, as a preliminary question, if he was a member of the coroner's jury upon the inquest held over the dead body of the child, in such case, and where the jury sat. (p. 601).

10. PRISONER—*Charged With Previous Homicide—Evidence.*

Where the prisoner, on a former occasion, has been charged with having murdered a person, other than the one for the killing of whom he is on trial, and such former homicide is in no way connected with the other, and the prisoner has been acquitted of such former charge, it is improper for the attorney for the State, in cross-examining a witness, to propound questions or make remarks, relating in any way to the prisoner's connection with such former homicide, he not having put his character in issue. (p. 598).

11. PRISONER—*Cross Examination—Evidence.*

Upon the cross-examination of the prisoner as a witness in his own behalf the grounds may be laid for the purpose of contradicting him as to any material matter, although evidence in chief of such material matter was not introduced, but this can be done for no purpose other than to impeach his credit as a witness. (p. 602).

12. TESTIMONY—*Order of—Trial Court.*

The order of introducing testimony is in the sound discretion of the trial court, and it is not error to permit the introduction of evidence out of its regular order, unless it appears that the prisoner was, or may have been, prejudiced thereby. (p. 604).

13. EVIDENCE—*Rebuttal.*

Where witnesses for the defense have testified, in chief or on cross-examination, as to material matters, and the grounds have been laid for contradicting them, witnesses may be called to testify in rebuttal for the purpose of such contradiction. (p. 605).

14. EVIDENCE MUST BE MATERIAL.

Whether a matter is material or collateral, as regards the impeachment of witnesses, depends upon whether the cross-examining party is entitled to prove it in support of his case. (p. 606).

15. EVIDENCE—*Proper—Material.*

It is competent to prove against a person charged with murder, that, while confined in jail, in reply to the question of a stranger, concerning the murder, he said "I could tell you the time and all about it, but they told me not to say anything about it;" it is for the jury to determine what the language means and how much weight shall be given to it. (p. 607).

16. VOLUNTARY DECLARATIONS—*Relevancy.*

While voluntary declarations or extra-judicial admissions of one charged with homicide, concerning its commission, are admissible in evidence against him, evidence of declarations, which he denies having made, and which are not shown to have related to the homicide or to the deceased, although, if made, they may have related to it or to the deceased, are not admissible against him. (p. 598).

17. INSTRUCTIONS—*"Presumed" Necessary.*

Point 11 of the syllabus in *Cain's Case*, 20 W. Va. 679, is a part of the settled criminal law of this State, and it is deemed an unwise and unnecessary innovation to so alter the language there used—"A man is presumed to intend," etc.—as to make· it read, in an instruction to the jury, "A man intends," etc. (p. 608).

18. INSTRUCTION MUST REFER TO EVIDENCE.

It is essential to maintain the distinction between juridical and moral truth, and it is error to give an instruction in which there is no reference to the evidence in the case. (p. 609).

19. CIRCUMSTANTIAL EVIDENCE—*Sufficient to Convict.*

A person charged with crime may be convicted on circumstantial evidence alone, if the jury believe from such evidence, to a moral certainty and beyond a reasonable doubt, that the defendant is guilty of the crime alleged against him; and the jury may be properly so instructed and that they have the right to convict upon such evidence in a case in which the evidence is circumstantial, if, from it, they so believe the defendant is guilty, and, further, that such evidence is not only competent but is sometimes the only mode of proof in criminal cases. (p. 610).

20. INSTRUCTION IN MURDER—*Reasonable Doubt.*

In a trial upon an indictment for murder it is error to give the following instruction: "The court instructs the jury that reasonable doubt to warrant acquittal in criminal cases is not mere possible doubt, but is such doubt as, after mature comparison and consideration of all the evidence, leaves the minds of the jurors in such condition that they cannot say they feel an abiding conviction of the truth of the charge, or for which reason can be given:" it being uncertain whether the clause, "for which reason can be given," qualifies the word "doubt" or the word "conviction." (p. 610).

21. INSTRUCTIONS EMBODIED IN OTHERS.

It is not error to refuse to give an instruction, enunciating propositions of law which are fully and specifically set forth in other instructions given in the same case. (p. 610).

22. FELONY TRIAL—*Prisoner Must be Present.*

In a case of felony, it is reversible error to proceed with the examination of a witness, in the absence of the prisoner, although the questions propounded and answered, in his absence, are preliminary questions, and, upon the return of the prisoner, the same questions are re-asked and re-answered in exactly the same way, and no exception is taken on the grounds of such irregularity at the time, for, to be present at all stages of the trial, is a constitutional right of the prisoner which he cannot waive and of which he cannot be deprived, and such error cannot be cured. (p. 611).

,Error to Circuit Court, Wirt County.

Samuel Sheppard was convicted of murder, and brings error.

*Reversed.*

T. A. BROWN, D. C. CASTO, D. H. LEONARD and W. W. AR-NETT, for plaintiff in error.

ATTY. GEN. R. H.. FREER, ALEX DULIN and F. C. COPEN, for the State.

POFFENBARGER, JUDGE:

On the 16th day of November, 1900, Samuel Sheppard was convicted in the circuit court of Wirt County of one of the foulest and most brutal murders recorded in the annals of crime. On or about the first day of April, 1900, he had been married to Allie Gorrell. She and her little boy, Lee Gorrell, an illegitimate child, aged about seven years, were the victims of this crime, which occurred at the home of Samuel Sheppard on the night of Tuesday the 21st day of August, 1900. Sheppard on the afternoon of that day had left home and gone to his brother Charles Sheppard's to assist him in digging a cellar. That was about one mile from where he lived. Instead of returning home after his day's work, he went to the home of his father, M. V. Sheppard, which place was about a mile and a half or two miles from his home. He claims to have had two purposes in going there, one to borrow a shovel to use in digging the cellar and the other to get a sack of apples, although he had apples at home but not of the kind he claims to have gone after. He claims to have remained at the home of his father during all of that night. He was there the next morning and, upon leaving, took some apples in a sack and the shovel and went to his brother's, where he worked during the greater part of the day. At 5 or 6 o'clock in the afternoon of Wednesday the 22d day of August, he went back to his house which consisted of one main room with a door and window in the front and a shed kitchen in the rear with a door at each end, another door opening from the kitchen into the main room and a window in the rear opposite the door leading to the main room. He claims the doors were all closed, but that the kitchen door near the smoke house and the door opening from the kitchen into the main room were not locked nor fastened, and, after throwing the sack of apples down at the

smoke house, he entered the unfastened kitchen door and went to the door opening to the main room, and pushed it open and saw his wife lying on the floor in a pool of blood with only her night clothes on and they drawn up around her body under the arms. He says he called to her twice but received no answer. Then turning to go away he saw her move, and as he went out through the other kitchen door he unlocked it. He says he then jumped the fence and ran towards the house of a neighbor by the name of Ott, and, as he did so, he saw the wife of Steve Price, another neighbor, in the field and hollowed over to her that his wife was killed or murdered. He then saw another woman and hollowed to her that his wife was lying on the floor "all mashed up." Price Ayers was coming down the road in his wagon, and he stopped his team and ran to Sheppard and they together went to the house, but concluded not to go in or touch anything until somebody else should come. They then hollowed to John Vandall, another neighbor. Not being able to make him hear at first, Ayers went after Vandall but returned to Sheppard before Vandall came. In the meantime, Mrs. Mattie Ott had come. Sheppard and Mrs. Ott then went into the house, but as to whether Ayers went in at the same time he and Sheppard seem to differ in their testimony. Sheppard says that as he went in the second time he saw the little boy on the bed and looked at him a moment; called his wife's name but received no answer and then went to the window and removed a quilt which hung over it. He told Mrs. Ott to get some water and open the front door and she being unable to open it, he went and opened it himself. Mrs. Ott told him she could not give his wife the water but would get it for him. He told her to get it and he would give it to her and she did so, and he, with a wet cloth, washed her mouth and nose and gave her a little water with a spoon.

The little boy was lying on the back part of the bed dead. The right side of his head had been crushed with the poll of an ax. He had no clothing on except a waist and the front of the bed was covered with blood. Mrs. Sheppard's wound was also from an ax, the right side of her head being crushed. She was un-conscious, and, although she did not die until the 31st day of August, she never regained consciousness nor uttered a word. The ax was found in the room, partly under the bed on which the little boy lay, with blood on it, and Sheppard admits that it

was his ax. He was brought to trial on the charge of having murdered his wife, was convicted, and has brought the case here on a writ of error.

Stella Ayers, aged ten years, and daughter of Mrs. Johnathan Ayers, sister of Mrs. Sheppard, living near her, says she went to the Sheppard house Wednesday in the early afternoon and found all the doors fastened and she was unable to arouse any person, although she thought she heard Mrs. Sheppard moaning.

Much of the testimony relates to the conduct of the prisoner before and after the homicide. Price Ayers says that as he and Sheppard ran to the house he said, "Sam, where is little Lee?" and that Sheppard said, "My God, I don't know." He and several others testify that shortly after this ghastly discovery and after a number of people had gathered, Sheppard asked some of them to feed his chickens and they did so, but that afterwards he went and fed them again and fed his hogs, that after dark he lay down in the kitchen and slept the greater part of the night, that when the physicians came he asked them no questions about his wife, that he did not go in to see her that night, and that he seemed to be indifferent as to her fate. He claims he was sick that night. Ayers says that, as he and Sheppard went to the house, Sheppard told him the doors were all fastened except the back kitchen door and it was standing ajar about two inches and that the middle door was open. Price Ayers says that while Sheppard was giving his wife some water, he, Ayers, discovered the little boy and said to him, "Sam, there is little Lee," but that Sheppard paid no attention to him; and that a light was then brought and he said again," Sam, there is little Lee lying there in bed with his brains knocked out with your ax," but that Sheppard never acted as if he saw the boy nor looked around at the bed.

Several of the witnesses say that there was an offensive odor in the room from the dead body of the child and arrangements were made for burying the body on Thursday at Sandyville, a place twelve or fifteen miles distant and on the railroad. Sheppard's house was about five miles from Leroy on the railroad which was the nearest point from which a casket could be obtained. M. V. Sheppard, the father of Samuel Sheppard, says he arranged with the undertaker at Leroy for a casket, that it was arranged to ship and inter the body on Thursday, that he was to send four men to McLain's store for a coffin to be sent there from Leroy

and have it carried across the hill, that he had sent them but the casket had not arrived, and that it was necessary to send the body over on Thursday that it might go on the train so as to reach Sandyville in time for the interment. It is admitted that Sam Sheppard went to the stable and got a goods box and the body was placed in that and taken from the house in a wagon, and it is claimed that he kicked or knocked the end out of it in a rude way. The State attaches importance to the conduct of Sheppard on this occasion, it appearing from the evidence of Price Ayers that Sheppard said to him: "You tell Mr. Ott to take that child out of here," and that he replied, "My Lord, Sam, the casket ain't come," to which Sheppard said in return, "That is all right." It is also admitted that he laughed at some incident as the body was taken away. On the following Saturday, Sheppard was arrested and while in custody of the officer it is said by two witnesses that he said, "There are others that need their brains knocked out," or "need knocking in the head," or words to that effect. One witness says his langauge was: "I would just as leave be shot as to have to lay in jail; they need not think they can scare me; there is two or three more who ought to have their brains knocked out." The defense introduced evidence tending to show that this language was directed to these two witnesses, Full and Bumgarner. Another witness testifies that Sheppard's father and brother on Wednesday evening, finding him on the porch urged him to go in the house, saying he had been working that day and would take cold and further that people were talking about his conduct and he ought to go in the house. On the day of his wife's death he was in jail and testimony was introduced to the effect that in the afternoon of the same day on which he received information of his wife's death, he played a French harp and sang, and that on other occasions shortly afterward he was mirthful and noisy, so much so that the jailer spoke to him about his conduct.

The State relies upon a number of circumstances prior to the murder, tending to show on the part of the prisoner a motive for, and the intention to commit the crime. Allie Sheppard owned the undivided one-half of a farm in Jackson County, consisting of eighty or ninety acres with good buildings on it, worth probably fifteen hundred dollars. In March, 1900, just a few days before the marriage, the personal estate left by her mother was sold, she bidding in a considerable portion of it, and Shep-

pard was there and manifested great interest in her purchases and took charge of them. J. L. Ayers, the husband of the sister of Allie Sheppard, who owned the other half of the farm, testified that on one occasion the following conversation took place between him and Sam Sheppard: "Sam, what made you come so often? What made you run after Allie?" "Well, I could not sleep, two or three nights I could not sleep at all; she has money." Ayers and his wife testify that Sheppard while at their house, and during the conversation, relating to some correspondence between Mrs. Ayers and the grand mother of the murdered child, said to Mrs. Ayers, "You had better write to him to come and get his boy," meaning the father of the child. To this Mrs. Ayers replied, "Well, she will never give her boy up." At a time not long before the murder, the boy was with Sheppard and his brother while they were stacking wheat, and, on refusing to stay at the wheat stack and keep the cattle away, Sheppard broke off an iron weed and whipped him with it. William Ott and his wife say that, after that occurrence, Sheppard was up at their house and told them about the whipping of the child and said he had given him about twenty before he conquered and, further, that he did not like the child's turn or disposition and that he was always talking of killing, cutting, or shooting somebody. David Murphy testifies that Sheppard had told him that he did not like the disposition of the child and was going to dispose of him. And Murphy then said to him, "Sam, Allie will never part with Lee," in reply to which he said he was going to dispose of the child some way and if he could not bet shut of the child he was going to get shut of both of them. It appears from the evidence that the kitchen door by which Sheppard says he entered, had an ordinary thumb latch on it, and although the catch might be turned on the inside so as to hold the latch down, it might still be opened by lifting the door up slightly.

The defense relied largely upon an *alibi*. In addition to what has already been stated on that subject, it was shown by the testimony of Sam Sheppard and others that he not only went to his father's house on the evening of August the 21st, and was there in the early morning of August the 22nd, but that he obtained and took away from there some apples in a sack, as he said he did, and that he was at his father's house between ten and eleven

o'clock on the night of August the 21st. This latter is testified to by his brother, Henry Sheppard, who had been away from home during the day and did not return until that hour, he having accounted for his time during the day and evening up until that hour. Returning home at about that hour, and not having had his supper, he went to the kitchen, lighted a lamp and was eating a lunch at the table, when Sam Sheppard came to the door and spoke to him, and was bareheaded and barefooted. It is admitted by the prisoner and all the members of the family that he slept that night in a small room opening on the porch and not immediately connected with any other room of the house. He says he got up at that time and got a drink of water. A grandson of Samuel Sheppard's father was there at the time and says he had been sleeping in that room for two nights and went in there to go to bed on the night of August the 21st, and the accused told him to sleep with Henry. This is admitted by the prisoner. It is testified by the members of the Sheppard family that he was always averse to sleeping with any one. L. W. Wood testifies that he saw him passing his house in the early morning of August the 22d, carrying a sack with something in it. A number of witnesses testify that the sack, partially filled with applies, was found at the front gate at Sheppard's home on the evening of August the 22d, although he claims to have left at at the smoke house. The prisoner's father testifies that he saw him with the apples, but did not see him have a shovel, when he left, but says he found afterwards that his shovel was gone and that it was at the home of his son, Charles Sheppard, where Sam Sheppard claims to have taken it. Charles Sheppard testifies to the same facts stated by the prisoner, concerning the digging of the cellar. Wade Sheppard, another brother, and the owner of the farm on which Charles Sheppard lived, was away from home at the time and did not return until the next week, and he says Sam Sheppard owed him some money and that it was arranged that he should help to dig the cellar and that he, Wade, had left one dollar and fifty cents with Charles with which to pay the accused for his work after crediting on the work what he owed him. Nearly all of the members of the Sheppard family testify that they had never heard of any trouble between Sheppard and his wife or the little boy and that they had all treated each other well. Wade Sheppard says he

was present when the prisoner received the information of the death of his wife and that he bowed his head for a minute and said, "Well this is very hard," and wanted to know if he would be allowed to go to the funeral, and, being informed that he could not, stood there awhile and then went and laid down on the bed and appeared to be very much depressed. J. L. McGee notified him and he says he thinks Sheppard said, "That is too bad," though he is not positive as to the language, and that Sheppard was not demonstrative. Only so much of the evidence is given here and elsewhere in this opinion as is deemed necessary to a proper understanding of the questions raised in the assignments of error and disposed of in this opinion.

In the petition there are thirty-eight grounds of error assigned, the first of which is, that the court erred in overruling the motion to quash the indictment. The indictment is in the form prescribed in section 1 of chapter 144 of the Code, and there is no longer any question about its sufficiency. That was settled long ago in *Schnelle's Case,* 24 W. Va. 767; *Smith's Case,* 24 W. Va. 815; *Flanagan's Case,* 26 W. Va. 116; and *Baker's Case,* 33 W. Va. 319.

The plaintiff in error filed his petition for a change of venue, supported by a number of affidavits in which the affiants express the opinion that the defendant could not have a fair trial in Wirt County. Some of these affidavits show that, at about the time this crime was committed, there was a good deal of excitement and feeling against the accused in certain portions of Wirt County and an adjoining portion of Roane county, that at places in the neighborhood in which Sheppard lived there had been some rumor or talk of mob violence, and that certain individuals having an extensive acquaintance in Wirt County had talked to a great many people and satisfied themselves that there was a great deal of prejudice against Sheppard in the county. Several of these affiants admit that at the time of the trial the excitement and feeling had subsided considerably. A number of affidavits were filed on the part of the prosecution denying the existence of prejudice, excitement, or feeling which might prevent a fair and impartial trial and no trouble seems to have been encountered in securing a competent jury. While many of the authorities hold that the obtaining of a competent jury is conclusive against the prisoner upon a motion for change of venue, such is not the law in this State. In *State* v. *Flaherty,* 42 W.

Va., 240, this Court held that the fact that a jury free from
exception can be impaneled is not conclusive on such a motion
that prejudice does not exist, and will not justify the court in re-
fusing to receive other evidence to support the motion. In the
opinion of the Court, JUDGE BRANNON says, influences, silent,
yet potential, may permeate the community, endangering an
impartial trial. It is equally well settled by the decisions in this
State and in Virginia that the affidavit for a change of venue
must state facts and circumstances from which the conclusion is
deduced that a fair trial cannot be had, and that the court must
be satisfied from those facts, and not from conclusions or opin-
ions of the defendant or his witnesses, that such fair trial can-
not be had. *State* v. *Douglas,* 41 W. Va. 537; 4th Minor's Insti-
tute, 676; *Boswell* v. *Flockhart,* 8 Leigh 364; *Wormley's Case,*
10 Grat. 658; 4 Am. and Eng. Ency. Law 818.

It is also a general rule that the granting of a change of venue
is discretionary with the court and subject to revision only in
cases of abuse, 28 Am. and Eng. Ency. Law 96; 4 Am. and Eng.
Ency. Law 818; but it would hardly be so here, where the con-
stitution guarantees it, when good cause therefor is shown. The
burden is on the prisoner to show to the satisfaction of the court
good cause to have the trial of the case removed and such cause
must exist at the time the application is made. *State* v. *Greer,*
22 W. Va. 300; 4 Am. and Eng. Ency. Law 560. Section 14 of
article III of the Constitution of this State, said article being
our bill of rights, provides that: "Trials of crimes and misde-
meanors, unless herein otherwise provided, shall be by a jury of
twelve men, public, without unreasonable delay, and in the
county where the alleged offense was committed, unless upon
petition of the accused, and for good cause shown, it is removed
to some other county." This is the common law rule and
Blackstone in speaking of causes for removal says: "Where the
question has an extensive local tendency; where a cry has been
raised and where the passions of the multitude have been in-
flamed; or where one of the parties is popular, and the other a
stranger or obnoxious." He says to summon a jury laboring
under local prejudices, "Is laying a snare for their consciences,
and, though they should have virtue and vigor of mind suffi-
cient to keep them upright; the parties will grow suspicious and
resort under various pretenses to another mode of trial." He

introduces this paragraph by saying "The administration of justice should not only be chaste; but (like Caesar's wife) should not even be suspected."

Applying the principles and rules, just referred to, in the clearly discernible spirit in which they have been fixed in the jurisprudence of the State, it cannot be doubted that the court below, committed no error in overruling the motion for a change of venue. Whatever talk there may have been about mob violence was largely among people outside the county and of those who were citizens of the county the affidavits indicate that few participated in it and these were confined practically to the neighborhood in which the crime was committed. These manifestations of a spirit of violence toward the prisoner occurred at about the time of the commission of the crime which was in August, 1900, and the trial did not occur until nearly three months afterwards, in November, 1900. These are the only facts stated in the petition and affidavits. The balance of the testimony consists merely of the opinions of certain individuals that a fair and impartial trial could not be had. That these opinions, in several instances, are based upon conditions long prior to the date of the trial appears from the testimony of some of the witnesses, who state that the feeling referred to had existed but had largely subsided. This Court decided in *Greer's Case, supra,* that the cause of removal must exist at the time the application is made. The record in this case fails to show the existence of such feeling or prejudice against the prisoner, at the time he was tried, as could have endangered a fair and impartial trial, and there is not even an intimation that there was any talk of violence toward him at that time.

The third assignment of error is that the court permitted a witness to testify that in the year 1900, Sheppard had said to her that he had heard that Allie Gorrell had deeded what property she had out of her hands and that if that was the case he would not have her to save her life or anybody else, and then asked if the child had an estate coming to it. The theory of the prosecution is that Sheppard murdered his wife and her child to obtain her property. In 9 Am. and Eng. Ency. Law at page 675, it is said, "All acts and conduct of the deceased previous to the fatal encounter may be shown in evidence, which form a part of the *res gestae,* or which in any manner tend to shed light upon the question of motive or malice, or of legal provocation, or

upon the question whether the defendant committed the homicide. But acts or conduct of the deceased which are not a part of the *res gestae,* and which could not in any manner have influenced the defendant in the commission of the homicide, cannot be shown." At page 688 of the same volume it is said, "Evidence of prior acts of defendant, though they were not shown to be a part of the *res gestae,* is admissible when such facts legitimately tend to establish motive or intention in defendant to commit the crime with which he is charged; and such evidence is admissible for that purpose only. Its admissibility is not limited as to the time or place of the act or acts, but they may be shown whenever they will serve to cast light upon the question whether defendant committed the homicide, or whether he did it with malice, or with premeditation and deliberation." "Where it appears that the homicide may have been committed in order to enable the slayer to possess himself of property belonging to the deceased, or to obtain or destroy evidence of indebtedness from himself to the deceased, it is competent to prove the business and social relations between the defendant and the deceased for a reasonable time before the commission of the homicide." 9 Am. and Eng. Enc. Law 707. "Upon a trial for indictment for murder it is admissible to show that the deceased was, at or near the time of the homicide, possessed of a considerable amount of money, or things of value, which tempted the avarice of defendant and so constitute a motive for killing the deceased." *Idem,* 713.

The testimony complained of under this assignment relates to only one of a number of circumstances upon which the prosecution predicates the theory that the defendant was avaricious and was actuated in all his relations with the deceased by the desire to obtain her property. Proceeding upon that theory it was shown that the deceased owned an undivided one-half of a farm worth probably fifteen hundred dollars ($1,500.00), that she had an interest in the personal property of which her mother had been possessed at the time of her death, that Sheppard attended the sale of this property with her and was very watchful of her interests there, that he inquired as to whether the child had an estate coming to it, that he said he would not have her if she disposed of her property, and that at the sale she had bought a gun which had belonged to her father, for ninety-five cents and that Sheppard had said "I will 'tend to that gun some of these

days, you paid ninety-five cents for it," to which she replied, "It don't make any difference; I would have bid all my estate in for Lee." The fourth, fifth, sixth, seventh, eighth, ninth, tenth, and eleventh assignments of error relate to testimony admitted concerning these facts. It is not only competent to show any facts or circumstances which may have constituted a motive on the part of the prisoner in the commission of the crime with which he is charged, but, as we have seen, it is competent to prove the business and social relations existing between the defendant and the deceased for a reasonable time before the commission of the homicide. How much weight these circumstances are entitled to, is a question for the jury, each to be taken in connection with all the others and all other facts in the case. The declaration that he would not have her in case she disposed of her property, his comment upon her purchasing the gun, a mere trifle, indicating, however, that he considered it a waste of money, his conduct at the sale, his knowledge of the value of her property, his inquiry before the marriage as to whether the child had an estate coming to it, may all have been consistent with an honest purpose and fall far short of proving him guilty of the crime with which he is charged. At the same time they are consistent with the theory of the State that he married the deceased and put her and her child to death, with a view of obtaining all or a portion of her property. All these circumstances, therefore, were properly admitted as evidence under the rules and principles of law, and the weight to which they were entitled, taken in connection with all the other evidence, was a matter for the fair, impartial and unbiased consideration of the jury.

The twelfth and thirteenth assignments of error are based upon the action of the court in permitting witnesses Lewis Full and John P. Bumgarner to testify that the prisoner had stated while under arrest that there were others who ought to have their brains knocked out or needed knocking in the head. This testimony is not admissible under the rules heretofore adverted to, nor as a part of the *res gestae*. The language attributed to the prisoner is not indicative of any motive or purpose which may have actuated him in so doing, if he did commit the crime. The crime was committed on Tuesday night, and he was arrested and made this remark on the following Saturday. It is too remote in time, being subsequent to the date of the com-

rission of the crime, to be considered a part of the *res gestae.*
Besides that, it was contemporaneous with his arrest, an act
which is separate and distinct in its nature and character, as
well as in time, from that of the commission of the crime. This
distinction was recognized in *Crookham's Case,* 5 W. Va. 510.
After the deceased had declared he was dying, and while he was
dying, he said: "It was hard to die by the hand of another and
leave his family." The Court held that it was error to admit
the declaration as part of the *res gestae* because it was too re-
mote from the transaction. But is it admissible upon any other
ground? It is said in 9 Am. and Eng. Enc. Law at page 691,
"Where the charge that the defendant is the slayer is disputed,
it is proper to show for the consideration of the jury, the con-
duct and appearance of the defendant at or near the time of
the commission of the homicide, as indicating his mental condi-
tion. And for this purpose actions showing nervousness, excite-
ment, or fear when first informed of, or charged with the crime,
or silence, or manifesting a lack of concern at the death of the
deceased, where sorrow is natural and to be expected, may be
proved against the defendant." The language addressed to the
witness indicates some other person than the deceased. His
reference to persons having their brains knocked out, that being
the condition of his wife and the child, might be indicative of a
lack of concern or respect for them but, it having been made
under circumstances which, if the prisoner was innocent, were
sorely aggravating and painful, it may not have meant more
than a manifestation of anger towards persons concerned in his
arrest. The mental condition of the accused and his feeling to-
ward the deceased, whether friendly, hostile or otherwise, being
a legitimate subject of inquiry by the jury, this expression on the
part of the prisoner was properly permitted to go to the jury,
they to ascertain, upon considering all the evidence, what it
meant, and, if found applicable, to give it such weight as in their
impartial judgment it was entitled to. When one is charged with
crime, anything he says or does voluntarily, which can have any
bearing toward showing his guilt, is competent to go to the jury
for what it is worth, of which the jury alone can judge. *Kin-
ney's Case,* 26 W. Va. 141.

The fourteenth assignment of error is to the action of the
court in permitting David Murphy to testify that the prisoner
had told him prior to the homicide and in a conversation in

which the witness had said something about having gotten Allie, "Yes, that he was going to get all he could," and was going to dispose of the child, and, if he could not get shut of the child, he was going to get shut of both of them. This testimony is consistent with the theory of the prosecution, tends to show motive and intent, was proper for the consideration of the jury and entitled to such weight only as reasonable, fair, and impartial men, acting under their oaths and with a due sense of their responsibility, might give it. The fifteenth assignment of error is not well taken. The witness was asked whether he was one of the coroner's jury and where the jury sat. The court permitted him to answer the last question over the objection of the defendant and exception was taken. It was merely a preliminary question in the introduction of the witness to testify as to certain things he had observed about the premises, the inquest having been held at the home of the defendant. The sixteenth assignment of error is grounded upon the action of the court in permitting counsel for the State to ask certain questions, relating to the conduct of the prisoner on a former occasion, when he had justifiably or excusably taken the life of a man by the name of Somerville, for which he had been tried and acquitted. Certain testimony had been introduced by the State to show a lack of concern on the part of the prisoner for the death of his wife. Members of his family testified that he was of a stoical disposition and that on the occasions of the deaths of two of his sisters he had shed no tears nor manifested any signs of grief, although he and his sisters had been devoted to each other. In the cross-examination of one of these witnesses the counsel for the State propounded this question: "Did you see him after he killed Sommerville?" Objection to this question was sustained. The counsel then said: "Did you ever see your brother immediately after the death of anyone else than his two sisters when he was in trouble, or charged with it?" This being objected to, the counsel for the prosecution added the words "or interested in it?" The objection to this question as amended was overruled. Another question, permitted over objection, was: "Did you see him about six years ago when there was trouble up in your neighborhood in which he was interested?" The answer was "I suppose that I did." Then followed the questions: "What trouble was it?" "Was there such trouble as to call for expression or emotion?" and "Of joy or grief or sorrow that you have reference to?" All

of this was objected to and the answer was "Well, I do not re-
member six years ago how my brother acted." Exception was
taken to the answer as well as the question and remarks of the
attorney for the State. All remarks of counsel and questions,
relating to the fact that the prisoner had formerly taken the life
of another man, were objectionable and should not have been
permitted by the court. "Proof of other homicides or crimes,
having no connection with the one for which the defendant is on
trial, is irrelevant and inadmissible." 9 Am. and Eng. Ency.
Law 690. No connection between these questions and remarks
and their ostensible purpose is clearly perceptible. The justi-
fiable or excusable killing of a stranger is not calculated to pro-
duce the same or a similar state of mind and heart on the part
of the accused as would result from the death of a sister to
whom he was devoted. There is danger also that the jury will
construe these inquiries as an attack upon his character. Until
it is put in issue by him it cannot be attacked. 9 Am. and Eng.
Ency. Law 700. The reason assigned for these questions and
remarks is not sufficient to warrant an exception to, or a de-
parture from these two well established rules.

The seventeenth ground of error is that the court permitted
the counsel for the prosecution to propound to the defendant on
cross·examination, and required him to answer, the following
question: "Did the jailer have to come to you and admonish
you on the day that your wife died, and say to you, 'My God,
Sam, you ought not be carrying on this way, laughing and cut-
ting up and our wife just died.'" If the State relied upon this
circumstance and had any evidence of it such evidence should
have been introduced in chief. The jailer was put on the stand
afterwards and testified that he had admonished the prisoner
there on that day or the next day but was not positive as to which
day. It would have accorded better with the rules of practice
and procedure also to have shown in chief what the conduct of
the prisoner was on that day rather than what the jailer said to
him. Evidence of Sheppard's conduct on this occasion was ad-
missible upon principles already adverted to, and might have
been given in chief. Used in rebuttal, it was only competent for
the purpose of impeaching his credit as a witness. But the fact
that it was admissible as evidence in chief affords no ground of
objection to its use for the other purpose, he being a party to
the proceeding. 29 Am. and Eng. Enc. Law 795.

The eighteenth ground of error is the same in substance as the seventeenth and the same observations apply to it. The nineteenth ground of error is based upon the action of the court in permitting a witness to testify in rebuttal that the door leading from the kitchen to the main room could be opened from the outside with the blade of a knife, the latch being a wooden latch in the main room operated from the kitchen by a string, it having been shown that when the crime was discovered the string was pulled out into the main room. This relates to the order of introducing the testimony only and that is in the sound discretion of the trial court. Still it properly belongs to the evidence in chief. It is difficult to see how the prisoner could have been prejudiced by its having been given in rebuttal. The twentieth ground of error is that the court permitted the counsel for the State to ask the jailer this question: "On the day that Sam Sheppard learned that his wife was dead, did he want you to throw apple butter on Jackson, who was in the opposite cell?" and the further question, whether he had, on that day or the next day, admonished the prisoner and told him he ought to be ashamed of his conduct on that day. What has been said here as to the seventeenth assignment of error is applicable to this one.

The twenty-first assignment is that the court permitted the attorney for the State to ask Harry Holt, introduced by the State to testify in rebuttal, as to where he slept on Sunday night, and the witness to answer that he had slept in the room on the end of the porch. This relates to the alibi which was a part of the defense. It is claimed by the State, that, until Tuesday night, Harry Holt had slept in that room, and that, on that night, Sam Sheppard had sent him to another room. Other members of the Sheppard family had testified that Holt had not been sleeping in that room. It was therefore, proper to introduce testimony in rebuttal to contradict these witnesses, it all bearing a close relation to the conduct and whereabouts of the prisoner on the night of the murder, and, for that reason is material. The same may be said as to the twenty-second and twenty-third assignments of error, in which it is objected that the State was permitted to show, by Holt, where he slept on Tuesday night, how he happened to go there, and at what time Henry Sheppard came to bed.

The twenty-fourth ground of error is that the court permitted

Harry Holt to testify, in rebuttal, that, on Wednesday, he and Henry Sheppard went out hunting, in the afternoon, and, coming back to the house, they found Myrtle Sheppard crying, and she had told them about the murder, and that Henry had said to her, "There's no use crying like as if this ain't an every day occurrence all over the world." Henry Sheppard and Myrtle Sheppard had been asked about this statement on cross-examination and had denied it. Sam Sheppard was not present; neither Henry nor Myrtle Sheppard was charged with complicity in the crime; there was no charge of conspiracy, nor any shown in the evidence; and the facts that she had been crying and Henry had made the statement in question were immaterial, and as to them the witnesses could not be contradicted. The testimony was therefore improperly admitted even for the purpose of effecting the credit of the two witnesses. A witness cannot be contradicted as to a collateral matter for the purpose of impeaching him. The test as to whether a matter is collateral is whether the cross-examining party is entitled to prove it in support of his case. 29 Am. and Eng. Ency. Law 794; Whar. Cr. Ev., s. 484; State v. Goodwin, 32 W. Va. 177; Forde's Case, 16 Grat. 547; Greenleaf Ev. 462.

The twenty-fifth and twenty-seventh assignments of error are predicated upon the action of the court in permitting Mrs. Flora Ayers and Mrs. Mattie Ott to testify in rebuttal, over the objection of the defendant, that Mrs. M. V. Sheppard had told them, or had stated in their presence, that the defendant had gotten up very early on Wednesday morning—before daylight, Mrs. Sheppard having denied the statement in her cross-examination. This was proper testimony in rebuttal for it was material as to whether Sheppard was up before daylight that morning, and, as to that matter, contradictory statements of Mrs. Sheppard were proper evidence.

The twenty-sixth assignment is to the action of the court in permitting Mrs. Flora Ayers to testify, in rebuttal, over the objection of the defendant, that Mrs. Sheppard, the prisoner's mother, had told her, on the evening of August the 22d, that the defendant did not like children, and that she had told Allie not to let Lee fondle over him or bother him, Mrs. Sheppard in her cross-examination having denied that she had made such a statement. The court erred in admitting this statement, which relates to the character of the defendant. He had not put his

good character in this respect in issue. Until he puts his character in issue it cannot be attacked. It is true that there is evidence on the side of the defense that the prisoner's relations with his wife and her child were pleasant and agreeable, but that testimony does not relate to his general character or disposition toward children. The State might have shown, if it could, that his relations with his wife and her child were otherwise, but it could not base upon that testimony, an attack upon his general character, either in the evidence in chief or in rebuttal. 3 Greenleaf on Evidence, ss. 25 and 26; 3 Am. and Eng. Enc. Law, 110 and 111; 9 Am. and Eng. Enc. Law 699. If such evidence had been proper and material, and the witness might have been contradicted upon it, the evidence complained of would still have been improper, for the reason that the mother of the prisoner had not testified to his good character in this respect, but only that his relations with the members of his family were pleasant and agreeable, and that might have been true without regard to his general disposition or character.

The twenty-eighth ground of error is that the court permitted Isaac G. Davis to testify in rebuttal over the objection of the defendant, substantially, that he had passed by the jail, seen Sheppard at the window, called him, wanted to know what he was doing there, and if he was put in there on suspicion, that Sheppard had replied that he was, that he then asked him something about the murder, and Sheppard said, "I could tell you the time and all about it, but they told me not to say anything about it." Sheppard had been asked about this conversation on his cross-examination and had denied that he had used the language attributed to him, but had said that he might have told the man that he knew the night his wife was murdered. Does this mean that he knew the hour of the perpetration of the crime and the person who committed it, and under advice, or for other reasons, declines to disclose the information? If so, his admission and refusal amount to suspicious conduct, proper for the consideration of the jury. In 1 Arch. Cr. Pr. and Pl. (7th Ed.) 431, note, it is said, "The seeking of opportunities and means to commit a criminal act, the flight of the accused, concealing, or showing anxiety to conceal, evidence of guilt, are circumstances for the prosecution." At the same page it is said the same is true of concealing instruments of violence. In *Tooney* v. *State,* 8 Tex. App. 452, the acts and declarations of the defendant, in-

dicating apprehension on his own account because of the condi-
tion of the person whom he was charged with having fatally in-
jured, were held to be admissible against him. In *State* v.
*Hinckle,* 6 Iowa 380, evidence was admitted against the defend-
ant who was charged with the murder of his wife by poisoning,
that, upon being asked in the jail whether he did not get arsenic
with which to kill rats, answered that he did, and, being asked
where he got it, replied that it was none of the inquirer's busi-
ness. In *Aaron's Case,* 1 South 231, as stated in 1 Arch. Cr. Pr.
and Pl. 407, it appears that a colored boy under twelve years
of age, a slave, confessed that he had drowned a child by throw-
ing him into the well. He was seen at play with the child near
the well shortly before the child was missed, no other person
being with them. In searching for the child, the prisoner was
found up in a cherry tree. He pretended the child had gone up
the road, looked round, and called him; went to bed at night
without his supper; admitted the next morning he saw the child
fall into the well; gave no reason why he neglected to tell of it,
but quietly continued his work. When the child was found, and
taken out of the well, he came up, and seeing the corpse lying
on the earth, said, "So you have found Stephen." The rule
seems to be to admit almost every statement, made by the ac-
cused, after the homicide, which contains any reference thereto,
for the purpose of showing his conduct, his mental condition,
and state of feeling towards the deceased and respecting the
crime. Thus, it is said in 9 Am. and Eng. Enc. Law 694, that
"The voluntary declarations or extra-judicial admissions of one
charged with the homicide, concerning its commission, are ad-
missible in evidence against him." The declaration under con-
sideration here could not be regarded as more than an admission
of knowledge of the crime. It is in no sense a confession on the
part of the prisoner of his having committed the offense.
Whether it is more than a declination on the part of the accused
to talk about the homicide and the accusation against him is an-
other question to be determined. The witness virtually says he
so understood it, and the conversation was immediately turned
to other subjects. But this is a question that must be addressed
to an unbiased and impartial jury, and to be by them determined
in the light of all the circumstances of the case. The possibility
that the statement means more than that, compels the court to
admit it, either as evidence in chief or for the purpose of con-

tradicting the witness and affecting his credit, upon the principles already adverted to. It is to be noted here that in *Aaron's Case, supra,* all the declarations and conduct of the accused went to the jury. It was so in *Baker's Case,* 33 W. Va. 319, also.

The twenty-ninth assignment of error is to the action of the court in permitting a servant of the jailer to testify that she had overheard a whispered conversation in the jail between Sam Sheppard and Wade Sheppard, in which one of them said "I don't know how she got her feet turned around towards the door," she having been directed by the jailer to ascertain, if she could, what they were talking about. She further testifies that she did not know about whom they were talking, nor which of them used the language. This was in rebuttal, the prisoner and his brother having denied the conversation in their cross-examination and there having been no evidence of it in chief. Had it been shown by the testimony of the witness that this conversation related to the murdered woman, and that the accused had uttered the language in question, it would have been admissible, upon the same principle, and for the same purpose, as the declaration considered under the last preceding assignment. But there is nothing by which it can be certainly connected with the crime under investigation, or attributed to the prisoner. If the statement was made by Wade Sheppard, it does not charge his brother with the commission of the crime, and thus make it possible for him to criminate himself by his silence and acquiesence. If it was a part of a conversation so charging him, there is nothing to show such silence or acquiesence. It being impossible to tell what the subject of the conversation was, or by whom, or in what connection, the statement was made, the court should have excluded it, and erred in failing to do so.

It is claimed, in the thirty-second assignment of error, that the court erred in giving instruction No. 1, asked for on behalf of the State. This instruction is in the language of point 11 of the syllabus in *Cain's Case,* 20 W. Va. 679, except that the word "presumed" is omitted, and the court instructed the jury "That a man intends that which he does or which is the immediate or necessary consequence of his act," etc. It is unnecessary to determine here whether the omission of the word "presumed" from the instruction would be fatal to the verdict and judgment for the reason that the judgment must be reversed upon another ground. But this instruction as given in *Cain's Case* and numer-

ous other West Virginia cases has been so thoroughly and so often considered and approved that the opinion is here expressed that it is unwise and unnecessary to depart from it. It would be difficult to say to what extent such an innovation upon the settled criminal law of the State might result in danger to the lievs and liberty of citizens. This instruction is nothing more than the enunciation of the well settled and time honored rule of law dating back beyond *Hill's Case,* 2 Grat. 599. It was intended and operates as a means of judicially determining by the aid of the jury the necessary ingredients of murder known as wilfulness, deliberation, and premeditation in those cases in which it is shown that there has been a killing, unattended by any circumstance sufficient to excuse, justify, or reduce the crime to an offense inferior to that of murder in the first degree. It was formulated with great care and deliberation and has ever since been jealously guarded and preserved by the courts. The impossibility of ascertaining the secret intent existing in the mind and heart of the accused, when shown to have given a mortal blow, and of ascertaining and disclosing what mental functions were performed by him in the execution of the act, is recognized and provided for in this rule. It is a presumption of law and to leave out the word "presumed" destroys or at least impairs its character as such. It is not true that a man always intends that which he does or that which is the immediate or necessary consequence of his act, and the law holds no man to such responsibility. It does presume, however, that he so intends it, but it allows him, if he can, to rebut or overthrow that presumption. As throwing light upon the origin and reason of this rule of law the following is quoted from the opinion of the court delivered by Judge Duncan, in *Hill's Case*: "The principal difficulty, we apprehend, that exists in distinguishing between murder in the first and second degree, is in determining what proof is sufficient on the part of the commonwealth to show that the killing was wilful, deliberate, and premeditated. In order to elevate the offense from murder in the second to murder in the first degree, there must be proof that the accused deliberated; and that the killing was the result of such deliberation. This being proved, it is not material how recently the deliberation preceded the killing. The practical difficulty in cases of this kind, is, in determining what is sufficient evidence of deliberation. A homicide rarely declares his intention; nay, he often, under the disguise of friendship and

kind offices, sedulously conceals his fatal purpose. Even the resolution may be fixed, but the time and means not determined upon. The most wilful, deliberate, and premeditated murders would often go unpunished unless some means existed of proving the intention, independent of the admissions or declarations of the homicide. We are of the opinion that such means are furnished by the rule "That a man shall be taken to intend that which he does, or which is the immediate or necessary consequence of his act. 2 Stark. Ev. 738, and the authorities there referred to." As shown in the case of the *State* v. *Morrison,* recently decided by this Court the distinction between murder in the first degree and murder in the second degree, is that in the former a specific intent to take life shall accompany the act of the accused, and that, in the latter, such specific intent is not required to constitute the crime. It is clear from what is quoted from the opinion in *Hill's Case* that the instruction under consideration here is intended to mark, and, in the trial of persons charged with murder, effectuate and enforce this distinction. It would seem also that this instruction is applicable more properly to those cases in which extenuating circumstances are relied upon by the defense, rather than to those in which the act of killing is denied by the accused, without relying upon extenuating circumstances, to justify, excuse, or mitigate.

It is also insisted that the court erred in giving instruction No. 2, asked for on behalf of the State, which is as follows: "The court instructs the jury that if they believe to a moral certainty, beyond a reasonable doubt, that the defendant, Samuel Sheppard, on the night of the 21st day of August, 1900, gave to Allie Sheppard a mortal blow on the head, with a deadly weapon, inflicting a mortal wound, from which she lingered until the last day of August, 1900, and died from the effect of said mortal blow, then the prisoner is *prima facie* guilty of wilful, deliberate, and premeditated killing, and unless the defendant prove extenuating circumstances or they appear from the case made by the State he is guilty of murder in the first degree and the jury should so find." There is no reference in this instruction to the evidence in the case. It is a rule of law, too well known and understood for discussion, that every instruction must be grounded upon the evidence. The jury can found their belief upon nothing but the evidence, and instructions ought not to be so drawn as to leave it open to the jury to base it upon

anything else. The omission was no doubt a mere oversight, but to let it pass might be setting a dangerous precedent. "For the purposes of public justice, it is essential to maintain with rigor the distinction between juridical and moral truth. I may have, for instance, as a juror, a moral conviction of the guilt of the defendant on trial. He may have confessed his guilt to me; or I may have learned from persons, not called as witnesses, facts inconsistent with his innocence. This, however, is not to be permitted to have the slightest effect on my judicial reasoning; for, to punish even a guilty man without judicial certainty of his guilt would be recognizing a principle fatal to public justice." Whar. Cr. Evi., s. 4.

Instruction No. 3 given for the State is as follows: "The jury is further instructed that one charged with crime may be convicted by a jury upon circumstantial evidence alone, if the jury believe to a moral certainty, beyond a reasonable doubt, by said circumstantial evidence, that the person so charged is guilty of the crime alleged against him. Therefore the court instructs the jury in this case that they have the right to convict the defendant upon circumstantial evidence alone, if the jury believe from the said circumstantial evidence the guilt of the defendant to a moral certainty, beyond a reasonable doubt. And the court further instructs the jury that circumstantial evidence in criminal cases is not only competent evidence, but is sometimes the only mode of proof, and therefore, if the jury believe from the evidence and circumstances in this case to a moral certainty and beyond a reasonable doubt, that the defendant, Samuel Sheppard, with a deadly weapon, gave to Allie Sheppard a mortal wound, without any provocation, from which wound she died within a few days from the time it was so inflicted, that the said defendant, Samuel Sheppard, was guilty of willful, deliberate and premeditated murder, unless he shows extenuating circumstances, or they appear by the case made by the State, and if he fails to show extenuating circumstances, and they do not appear from the case made by the State and all the evidence considered, the jury should find him guilty of murder in the first degree." Exception was taken to the giving of this instruction. The only objection to it, offered by the defendant's counsel, is that there were no circumstances in the case to connect the defendant with the crime for which he was tried and that the circumstances were mere inferences based upon inferences. The

evidence, except what has already been shown to have been improperly admitted, was competent and it was for the jury to say whether from it, although in its nature what is generally termed, by the courts and law writers, circumstantial evidence, they were convinced, beyond a reasonable doubt, or to a moral certainty, these two phrases being equivalent, as held in *Commonwealth* v. *Costley,* 118 Mass. 1, that the defendant was guilty of the crime with which he was charged. As reasonable men, duly impressed with the gravity, importance, and responsibility of their situation, it was for them to say whether they believed, from this evidence, that the defendant was the perpetrator of this horrible crime. The instruction merely tells the jury that, in order to find the defendant guilty, they must believe, to a moral certainty and beyond a reasonable doubt, that he did commit the crime, and that his conviction on their part must spring from the evidence and circumstances in the case, and that, if, from it, they thus believed him guilty, they must so find, notwithstanding the evidence was circumstantial. To hold this instruction improper it would be necessary to say that there was no evidence in the case which the jury might consider. This would be an invasion of the province of the jury, for it would be a determination upon the part of the court as to the weight of evidence which is a matter for the sole consideration of the jury unless the evidence is clearly insufficient to warrant a verdict. What the evidence may be on the next trial of this case it is impossible to tell. Additional evidence against the prisoner may have been, or may be, found and the question of the sufficiency of the evidence to support the verdict may come to this Court after the next trial. For this reason it would be improper to indicate any opinion now respecting the sufficiency of the evidence to warrant the giving of this instruction or to support the verdict. For the present, therefore, the instruction must be held to have been properly given.

Another ground of exception is the giving of instruction No. 4, asked for on behalf of the State which is as follows: "The court instructs the jury that reasonable doubt to warrant acquittal in criminal cases, is not a mere possible doubt, but is such a doubt as, after mature comparison and consideration of all the evidence, leaves the minds of the jurors in such a condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge or for which reason

can be given." The phrase "reasonable doubt" is used in a number of instructions given both for the State and for the defendant. If it were possible to exactly define the term or expression and thus aid the jury in coming to a just conclusion it would be proper to do so. But it is said in 3 Greenl. on Ev. 15th Edition, s. 29, note, that "Jurists have not been very successful in defining what is a reasonable doubt, and are disinclined to be held to any form of words. A moral certainty has been said to be necessary to conviction. But this is as difficult to define as the former. And the court has refused to adopt this phrase as a necessary test in *Comm. v. Costley.* And the courts genreally are disinclined to enter into any explanation of what the terms "reasonable doubt" and "moral certainty" mean. And with good reason, for while these terms are well calculated to convey to the jurors a correct idea of what is expected of them, yet many subtleties and refinements might be imposed upon them by any attempt to limit the meaning." The instruction complained of was no doubt taken from the opinion in *Webster's Case,* 5 Cush. 320, where it is said "It is not mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." The last clause of the instruction "for which reason can be given" is in harmony with the authorities, if it had been inserted in the proper place, for it is said in the note just referred to that "All the authorities agree that such a doubt must be actual and substantial, as contradistinguished from a mere vague apprehension. An undefinable doubt, which cannot be stated with the reason upon which it rests, so that it may be examined and discussed, can hardly be considered a reasonable doubt, as such a one would render the administration of justice impracticable." The language of the instruction is also found in Wharton's Crim. Ev. s. 1, as quoted from Chief Justice Shaw in *Webster's Case* and is approved by that author. In 9 Am. and Eng. Ency. Law 737, it is said, "The term 'reasonable doubt,' does not mean every vague or conjectural doubt, but it is a substantial doubt—a reasanoable hypothesis—rising from the evidence, or a lack of evidence, inconsistent with the theory of the defendant's guilt. It should

be accurately defined to the jury in each case in language not to be misunderstood, which conveys that idea." Upon general principles it would seem to be eminently proper that the court, having used the term "reasonable doubt" in several of the instructions, given in the case, should be permitted to define it and give its meaning. In doing so, the court below has given a definition which has been approved by some of the highest courts and most reputable law writers. But the connection of the last clause is such as to make the instruction bad. Whether it qualifies the word "doubt" or the word "conviction" is uncertain, to say the least. This makes it uncertain in meaning, and, therefore, misleading. A conviction for which a reason can be given is not sufficient. The conviction must be such as to exclude any doubt for which a substantial reason can be given.

The defendant requested the court to give seven instructions and all of them were given except instruction No. 3, which is as follows: "The jury is further instructed that the evidence in this case is circumstantial, and in this case it is necessary—first, that the circumstances from which the conclusion is drawn snould be fully established; second, that all the facts should be consistent with the hypothesis as claimed by the State; third, that the circumstances should be a moral certainty, actually excluding every hypothesis but the one proposed to be proven, and that the circumstances should be so connected as to make a perfect chain of evidence, and that unless the jury believe from the evidence and circumstances proven in this case that the defendant is guilty to a moral certainty and beyond a reasonable doubt and to the exclusion of every hypothesis of his innocence, they should find him not guilty." A sufficient reason for refusing this instruction is that everything contained in it is given in the other instructions, asked for by the defendant. In instruction No. 4, the jury are told that circumstantial evidence must always be scanned with great caution and the circumstances proved must be of such character and tendency as to produce a moral conviction of the guilt of the accused. In No. 5, they are instructed that where the State relies wholly upon circumstantial evidence, it must make out its case by a chain of circumstances so intimately connected as to prove to a moral certainty and beyond a reasonable doubt, the guilt of the defendant. In No. 6, they are instructed that all the circumstances from which the conclusion of guilt is to be drawn must be established by

full proof and every circumstance, essential to the conclusion must be proved in the same manner, and to the same extent, as if the whole issue rested upon the proof of each individual and essential circumstance, and that, if the jury believe that any one of the circumstances from which the conclusion is to be drawn, and without which it could not be drawn, has not been proved and established by full proof, then the chain of circumstances, necessary to the conclusion, is not established, and the defendant is entitled to a verdict of not guilty. In No. 7, they are instructed that all essential facts and circumstances, so proved and established, must be consistent with the hypothesis of the guilt of the accused, and inconsistent with any other hypothesis, and that all such facts and circumstances should be of a conclusive nature and tendency. From this it is clear that instructions four, five, six and seven contain all that was asked for in No. 3. They also contain the law of circumstantial evidence as announced in *Flanagan's Case,* 26 W. Va. 117, as well as that enunciated in *Baker's Case,* 33 W. Va. 319. Upon that doctrine they are full and complete, and the court was not bound to repeat it or any part of it by giving instruction No. 3. It was, therefore, properly refused. *Kerr* v. *Lunsford,* 31 W. Va. 662; *Morrison's Case, supra.*

The next ground of complaint is that the following testimony was given by a witness for the State, in the absence of the prisoner:

Question—"What is your name please?"

Answer—"Flora Ayers."

Question—"What is your husband's name?"

Answer—"Jont Ayers."

The court certifies that, while these questions were asked and answered, the prisoner was not in the court house, but was then in the jail and was afterwards brought into court, and then the prosecuting attorney asked the witness the same questions, and, to them, she gave the same answers, but that the witness was not sworn in the presence of the prisoner. The absence of the prisoner was noticed by the court and the trial was suspended until he was brought in. No objection or exception was taken at the time, but after the verdict was brought in, the prisoner moved the court to arrest the judgment and set aside the verdict because he was not in court during all the trial, which motion the court overruled. This was a fatal error for which the judgment

must be reversed, the verdict set aside and a new trial granted. In Bishop's Crim. Proc., s. 687, it is said "The prisoner cannot be deprived of his right to be present at all stages of the trial." The same author says at s. 688 "In a case of felony or treason, the prisoner must be present during the whole of the trial, including the giving in of the evidence and the rendition of the verdict." In *Andrews* v. *State*, 2 Sneeds (Tenn.) 550, it was held that "In criminal cases of the grade of felony, where the life or liberty of the accused is imperiled, he has the right to be present and must be present during the trial and until the final judgment." In *Crump's Case*, 1 Va. Cas. 171. it was held "That in no case whatever, except where some statute hath otherwise directed, must judgment of imprisonment or unusual corporal punishment, be rendered, unless the defendant be present in court." It was held in *Sperry's Case*, 9 Leigh 623, and *Hocker's Case*, 13 Grat. 763, that it is absolutely necessary to a valid conviction that the prisoner shall be present in court when anything is done, in any way affecting his interest. A leading Virginia case on this subject is *Jackson's Case*, 19 Grat. 656. There, after the evidence was closed and the jury had retired, they came back into court and the court permitted a portion of the testimony of one of the witnesses, as taken down during the trial, to be read to them, at their request, in the absence of the prisoner as well as of the witness. During the reading of the notes, the prisoner was brought back into court, and afterwards, the witness, being then present, was re-examined by consent of all parties. This was held to be sufficient cause for setting aside the verdict, and upon this state of the case Judge Dorman, after quoting from several authorities, says: "These are citations sufficient to show the strict adherence to the rule in all trials where the life and liberty of the accused is in jeopardy. The law is made for the protection of the citizen, and all alike are amenable to its penalties and entitled to its immunities. Whatever may be the turpitude of his offense, however great his criminality, every man has a right to an impartial trial according to law, and, till found guilty by his peers, that law presumes him innocent, and gives him the right to be present to see and know all that is said or done by the court, affecting his case. From reason and authority it seems to be clear, that the court erred in permitting any part of the testimony taken down to be read over to the jury in the absence of the accused." In this opinion, the following is quoted

from *Wade* v. *State,* 12 Georgia 25, and approved, "The court has no more authority, under the law, to read over testimony to the jury, affecting the life or liberty of the defendant, in his absence, than it has to examine the witnesses in relation thereto, in his absence. The defendant has not only the right to be confronted with his witnesses, but he has also the right to be present, and see and hear all the proceedings, which are had against him on the trial before the court. It is said, the presumption must be, that the court read the testimony correctly, and read over all that was declared against the defendant; therefore he was not injured. The answer is, it was the legal right and privilege of the defendant to have been present in court, when this proceeding was had before the jury, in relation to the testimony delivered against him; and he is to be considered as standing upon all his legal rights, waiving none of them."

Upon this question the decisions of this Court have been uniform and have enforced this rule with all the rigidity and strictness that characterize the Virginia decisions. Thus, in *Younger's Case,* 2 W. Va. 579, it was held "A prisoner indicted for felony must be personally present during the trial therefor, and the record can alone be looked to for the evidence to prove such presence at every stage of the trial." In *Conkle's Case,* 16 W. Va. 736, this Court held that a person indicted for felony must be personally present during the trial; and such presence must be shown by the record. See also *Sutfin's Case,* 22 W. Va. 771. The very question we have here arose in *Greer's Case,* 22 W. Va. 800. In that instance, the prisoner, by permission of the court, retired in charge of the jailer, and, upon the prisoner's request, the jailer put him in his cell, without the knowledge of the court or the counsel on either side, and then returned to his seat in the court room. The court and counsel not observing the absence of the prisoner, and supposing he had returned with the jailer, proceeded with the cross-examination of a witness, and two questions were asked and answered before it was discovered that the prisoner was absent. The examination of the witness was immediately stopped, the jury were instructed to pay no attention to the evidence introduced in the absence of the prisoner and ruled out the same, and, when the prisoner returned, the same questions were put to the witness and the same answers received from him. This Court held in that case that the court below erred in refusing to set aside the verdict because of the

absence of the prisoner, while a part of the evidence was being introduced. JOHNSON, PRESIDENT, quotes and approves the strongest part of the opinion in *Jackson's Case*, and then says "We will not inquire whether the prisoner was unfavorably or otherwise affected by the cross-examination of the witness in his absence. He had the right to be present, which he did not and could not waive. He had the right to observe every look, gesture, or move of the witness while he was testifying; and it mattered not, that the court excluded the evidence and certified that it was repeated in his presence." From these authorities it is clearly a matter of no consequence that the evidence introduced in this case in the absence of the prisoner may not have affected him and that he did not at the time take an exception. To be present during every part of the trial was a constitutional right which he could not waive. Until this time, this Court has not only held that the right could not be waived but also that such an error cannot be cured. *Greer's Case, supra.*

The last assignment of error is based upon the action of the court in overruling the motion for a new trial. It was supported by numerous affidavits, tending to show that one of the jurors was disqualified, and that new evidence had been discovered after the trial. In resisting the motion, the prosecution filed an array of counter affidavits, denying the facts alleged in support of the motion. As the judgment must be reversed and the verdict set aside, upon other grounds, it is unnecessary to inquire into the propriety of the action of the court on said motion.

For the reasons herein stated, the judgment must be reversed, the verdict set aside, and a new trial granted, and the cause remanded to the circuit court of Wirt County, to be further proceeded in according to the principles herein announced.

*Reversed.*