# Staunton

ABBITT OWENS V. COMMONWEALTH OF VIRGINIA.

September 3, 1947.

Record No. 3234.

Present, Hudgins, Gregory, Eggleston, Spratley and Buchanan, JJ.

The opinion states the case.

*W. R. Ashburn,* for the plaintiff in error.

*Abram P. Staples, Attorney General,* and *M. Ray Doubles, Assistant Attorney General,* for the Commonwealth.

EGGLESTON, J., delivered the opinion of the court.

This case is before us on a writ of error to a judgment in the court below whereby Abbitt Owens was sentenced to serve five years in the State penitentiary, pursuant to the verdict of a jury finding him guilty of grand larceny.

One of the main assignments of error is that the verdict is contrary to the law and the evidence and without credible evidence to support it. Viewed in the light of the verdict the facts may be stated thus:

On August 2, 1946, W. M. Watkins, from whom the larceny was committed, was the manager of two housing

projects, both known as Suburban Parkway and owned by Lee Housing Corporation. One of the projects is located in Portsmouth and the other in Norfolk. As manager it was Watkins' duty to collect the rents paid by the occupants of the apartment units and deposit the collections in bank for the account of his employer. He maintained an office at each of the developments.

Owens, as a tenant, occupied an apartment in the Norfolk project, closely adjoining the apartment and office in which Watkins resided. On the date mentioned the two men had known each other for about two or three months, during which time they had become rather intimate. Prior to his employment as a rental agent for the Lee Housing Corporation, Watkins had been a taxicab driver. Sometime during the preceding year Owens seems to have been engaged in the business of selling electrical refrigeration fixtures, but at the time of the occurrences with which we are concerned, according to his own testimony, the business enterprise had become dormant. In fact, his testimony as to his means of support is vague and unsatisfactory.

Jackson Eugene Vaughan, who according to his testimony actually committed the theft, was an intimate friend of Owens and had frequent access to the latter's apartment. Vaughan was likewise well known to Watkins.

At the time in question Vaughan, in association with others, was preparing to open a "club" at 605 Colley avenue, in the city of Norfolk.

Owens desired to sublet his Suburban Parkway apartment and to sell his furniture therein, which required the consent of Watkins as the agent of the landlord. To further this purpose, Owens went to Watkins' Portsmouth office in the early afternoon of August 2. Watkins agreed to meet Owens and the prospective tenant at Owens' apartment that night to determine whether the subletting would be satisfactory. Owens remained at Watkins' office until after 6:00 p. m., during which time the two men had several drinks. They planned to go to Norfolk, have dinner at

a restaurant, and then proceed to Owens' apartment to meet the prospective tenant. Mrs. Wilson, Watkins' stenographer, was to accompany them.

Watkins testified that the safe at his Portsmouth office was out of repair and for that reason it was necessary that he take his rent collections of the day, consisting of $605 in money and $3,400 in checks, to his Norfolk office and deposit them in his safe there. Watkins further testified that, in Owens' presence, he (Watkins) prepared a deposit ticket for the rental collections and put them in a canvas bag which he locked in the trunk or rear compartment of his (Watkins') automobile. Accompanied by Mrs. Wilson the two men drove to Norfolk.

At Owens' suggestion the party went to Vaughan's club at 605 Colley avenue, in Norfolk. While Watkins and Mrs. Wilson remained in the car, Owens went into the apartment and returned with Vaughan. The quartet sat in the car and had a "round of drinks." After a short while Owens and Vaughan left the car and disappeared into the doorway leading to the hallway of the apartment. About ten minutes later Owens returned to the car and went with Watkins and Mrs. Wilson to a restaurant where they had dinner.

About 9:00 o'clock the three left the restaurant, proceeded to Owens' apartment in the Suburban Parkway in Norfolk, parked the car near by and went into the apartment.

Owens' prospective tenant came in about 10:30 p. m. He turned out to be George Barger who was well known to Watkins and entirely acceptable as a tenant. Thus the arrangement for which the meeting had been planned was concluded in a few minutes.

Strange as it may seem, although Watkins, Barger and Owens were well known to each other, and although Barger was entirely satisfactory to Watkins as a tenant, yet until this meeting Owens had never disclosed to Watkins that Barger was his prospective tenant.

Barger was accompanied to Owens' apartment by a Miss Anderson. After the business arrangement had been completed, which, as has been said, required only a few minutes, Owens and Barger began a card game which lasted until about midnight. During this time Watkins, Mrs. Wilson and Miss Anderson remained in the apartment.

About midnight Watkins and Mrs. Wilson prepared to leave. Owens announced that he would accompany them to Watkins' automobile. When the three reached the car they found that it had been plundered. The upright cushion in the rear seat had been pulled forward, the cardboard partition between the rear seat and the trunk compartment had been cut through, and the canvas bag containing the checks and money was missing. The glove compartment had been forced open and the wiring tampered with. In the car were found a kitchen knife and a screw driver which Owens later admitted were his property and had come from his apartment.

While Owens, Watkins and Mrs. Wilson were standing around the car discussing what should be done, Barger came down from the Owens apartment to see what was detaining Owens and interrupting their card game. After some discussion the parties proceeded to the Second Precinct Police Station where the occurrence was reported.

Detective Jones had Watkins relate his movements during the entire afternoon and evening and as a result of this recital Jones' suspicion rested on Owens. Jones ordered Owens detained at the police station while officers went to look for Vaughan who was located at the Colley avenue apartment. Upon a search of Vaughan's premises the canvas bag containing the checks and bankbook was found concealed in an unused oil heater. In a coat pocket $500 in currency was found, and Vaughan gave up the rest.

Confronted with this situation, Vaughan confessed that he had pilfered the car and implicated Owens as an accomplice. Vaughan said that when the party came by his apartment in the afternoon, Owens disclosed to him that a

considerable amount of money was in the rear of Watkins' car and that the vehicle would be parked in front of his (Owens') apartment during the early part of the night. Owens suggested, Vaughan said, that the latter break into the car and take the money. While Watkins, Owens and Mrs. Wilson were at the restaurant Vaughan said he proceeded to Owens' apartment, entered it with a key which Owens had loaned him, and procured the knife and screw driver which were used in pilfering the car.

In the meantime Owens had been questioned and had denied any knowledge of or connection with the theft. Vaughan was then brought into the room and in Owens' presence and hearing made the statement that Owens was his accomplice, and, indeed, had planned the theft in the manner we have related. In the face of this accusation Owens remained silent. He neither denied nor affirmed Vaughan's accusation. Thereupon both Vaughan and Owens were put under formal arrest and charged with the crime.

The two men were jointly indicted at the September term of court and elected to be tried separately. Vaughan was put on trial first and pleaded guilty. Pending the pronouncement of judgment on him he was admitted to bail in the sum of $1,000, his automobile being given as security.

Upon Owens' trial Vaughan was one of the principal witnesses for the Commonwealth and testified as has been stated.

It is argued that the testimony of Vaughan, the self-confessed accomplice, contains so many conflicting statements as to render it inherently incredible and unworthy of belief.

There are inconsistencies in the statements of this witness. Indeed, some of his testimony, as transcribed, is incoherent and meaningless. Manifestly, this is due in part, at least, to the inaccuracy of the reporter, for similar defects appear in the testimony of other witnesses and are the subject of comment in the briefs on both sides.

■ But the inconsistencies and inaccuracies complained of do not, we think, render the testimony of this witness inherently incredible or entirely lacking in probative value. In the main his testimony is corroborated by these uncontroverted circumstances:

Owens knew that a considerable amount of money had been placed in the automobile compartment and that the car would be at his (Owens') apartment that night. He must have conveyed the information to Vaughan, for how else could the latter have known it?

Owens had ample opportunity to convey the information to Vaughan while they were together, on two occasions, in the Vaughan apartment, out of the hearing of Watkins and Mrs. Wilson while the latter sat in the parked car.

Vaughan had possession of Owens' key, as testified by Vaughan, because Watkins had to gain access to Owens' apartment by the use of his (Watkins') master key. Moreover, the key to the Owens apartment was in Vaughan's possession when the latter was arrested.

Owens admitted that the knife and screw driver used by Vaughan in entering the car came from his (Owens') apartment, which corroborates Vaughan's statement that he entered the apartment while the party was at the restaurant.

■ Of course, the jury was not bound to have drawn these inferences from Vaughan's testimony and the surrounding circumstances, but they were amply justified in doing so. In our opinion there is ample evidence to support the verdict.

The next assignment of error challenges the action of the lower court in permitting Watkins to testify, over the objection of the accused, that the accused did not deny but remained silent in the face of Vaughan's statement implicating him (the accused) in the crime.

The trial court admitted this evidence on the theory that the fact that Owens had remained silent, under the circumstances, tended to show that he acquiesced in the truth of Vaughan's statement, that is, that his silence was an

implied admission of the truth and accuracy of the statement.

We applied the principle and upheld the admissibility of such evidence in *Tillman* v. *Commonwealth*, 185 Va. 46, 56, 37 S. E. (2d) 768, 773. See also, *Sanders* v. *Newsome*, 179 Va. 582, 592, 19 S. E. (2d) 883, 887, where the principle was recognized and applied in a civil action.[1]

The accused, in effect, asks us to repudiate our holding in these cases. He argues that the doctrine of implied admission, when applied to a criminal case, is wrong in principle, and that it violates the accused's constitutional and statutory privilege against self-incrimination. It is said that such evidence compels the accused "to give evidence against himself," in violation of section 8 of the Virginia Constitution; that it violates the provision of Code, section 4778, that "his failure to testify shall create no presumption against him;" and that it runs counter to the provision of Code, section 4781, as amended, which prohibits the use in evidence of a statement of the accused unless it be made "when examined as a witness in his own behalf."

In 20 Am. Jur., Evidence, section 570, pp. 483, 484, the widely recognized rule is thus stated:

"As a general rule, when a statement tending to incriminate one accused of committing a crime is made in his presence and hearing and such statement is not denied, contradicted, or objected to by him, both the statement and the fact of his failure to deny are admissible in a criminal prosecution against him, as evidence of his acquiescence in its truth. The basis of such rule is that the natural reaction of one accused of the commission of a crime or of implication therein is to deny the accusation if it is unjust or unfounded. The hearsay character of the incriminating statement made to the accused would render it inadmissible, except for the fact that the statement is not offered in evidence as proof of a fact asserted but as a predicate to the showing of the reaction of the accused thereto. Caution

[1] In the latter case we cited with approval the application of the principle by the North Carolina court in three criminal cases.

must be exercised, however, in receiving evidence of a statement made to the accused and his failure to deny it. In order that the silence of one accused of crime following a statement of a fact tending to incriminate him may have the effect of a tacit admission, he must have heard the statement and have understood that he was being accused of complicity in a crime, the circumstances under which the statement was made must have been such as would afford him an opportunity to deny or object, and the statement must have been such, and made under such circumstances, as would naturally call for a reply. The test is whether men similarly situated would have felt themselves called upon to deny the statements affecting them in the event they did not intend to express acquiescence by their failure to do so. * * * "

The text is supported by numerous cases, both State and Federal. Indeed, it seems to have the universal approval of both the courts and the text writers.[2]

Counsel for the accused cites no authority, nor have we been able to find any, to support his contention that the admissibility of such evidence violates the accused's constitutional and statutory privilege against self-incrimination. And yet both the Federal Constitution and that of every State contain privileges against self-incrimination similar to that in the Virginia Constitution.

As is said in 8 Wigmore on Evidence, 3d Ed., section 2263, p. 362:

"In the interpretation of the principle, nothing turns upon the variations of wording in the constitutional clauses; this much is conceded (*ante*, section 2252.) It is therefore immaterial that the witness is protected by one Constitution from 'testifying,' or by another from 'furnishing evidence,'

---

[2] See 4 Wigmore on Evidence, 3d Ed., section 1071 *ff.*, p. 70 *ff.*; Greenleaf on Evidence, 16th Ed., section 197, p. 330; 3 Jones Commentaries on Evidence, 2d Ed., section 1044 *ff.*, p. 1923 *ff.*; 22 C. J. S., Criminal Law, section 734, p. 1258 *ff.*; 43 Harvard Law Review 289; 21 Michigan Law Review 806; *Id.*, 936; 23 Michigan Law Review 413; 24 Michigan Law Review 508. Numerous cases on the subject are collected in the annotations in 80 A. L. R. 1235, 115 A. L. R. 1510.

or by another from 'giving evidence,' or by still another from 'being a witness.' These various phrasings have a common conception, in respect to the *form* of the protected disclosure. What is that conception?

"Looking back at the history of the privilege (*ante*, section 2250) and the spirit of the struggle by which its establishment came about, the object of the protection ·seems plain. It is the employment of legal process to *extract from the person's own lips* an admission of his guilt, which will thus take the place of other evidence. Such was the process of the ecclesiastical Court, as opposed through ·two centuries,—the inquisitorial method of putting the accused upon his oath, in order to supply the lack of the required two witnesses. Such was the complaint of Lilburn and his fellow-objectors, that he ought to be convicted by other evidence and not by his own forced confession upon oath.

\* \* \* \* \* \*

"In other words, it is not merely any and every compulsion that is the kernel of the privilege, in history and in the constitutional definitions, but *testimonial compulsion.* The one idea is as essential as the other.

"The general principle, therefore, in regard to the form of the protected disclosure, may be said to be this: The privilege protects a person from any disclosure *sought by legal process against him as a witness.*"

The same thought is thus expressed in Greenleaf on Evidence, 16th Ed., section 469-e, pp. 615, 616: "The scope of the privilege, in history and in principle, includes only the process of testifying, by word of mouth or in writing, i. e. the process of disclosure by utterance. \* \* \* "

On the other hand, the admissibility of an admission or a confession depends upon the application of a rule of evidence, that is, whether under the circumstances the admission or confession is trustworthy as testimony.

·"The principle upon which a confession is treated ˇas sometimes inadmissible is that *under certain conditions it becomes untrustworthy as testimony.*" 3 Wigmore on Evidence, 3d Ed., section 822, ·p. 246.

Dean Wigmore thus points out the difference between the privilege rule against self-incrimination and the rule of evidence governing the admissibility of an admission or a confession:

"Finally, a confession is not rejected because of any connection with the *privilege against self-crimination.* The circumstances that this privilege protects against a disclosure which is compulsory, and that one of the tests for a confession is whether it is voluntary or not, have naturally led to the occasional use of both arguments at once by counsel in opposing the use of such a confession; but the courts have properly kept the two principles distinctly apart. * * *

"The sum and substance of the difference is that the confession rule aims to exclude self-criminating statements which are *false,* while the privilege rule gives the option of excluding those which are *true.* The two are complementary to each other, in that respect, and therefore cannot be coincident. Their separateness has more than once been judicially pointed out." 3 Wigmore on Evidence, 3d Ed., section 823, pp. 249, 250.

An illuminating discussion of the subject is found in the opinion in *Wood* v. *United States,* 75 App. D. C. 274, 128 F. (2d) 265, 141 A. L. R. 1318, written by Mr. Justice Rutledge, now a member of the Nation's highest tribunal. That opinion points out (128 F. (2d), at page 268):

"The rule of evidence excludes untrustworthy communications. It arises from the common law. Except rarely, it has nothing to do with refusal to testify in court. It fills no need for checking abuses of *judicial* inquisition. For that the privilege stands guard. Rather the rule applies, more properly and frequently, to statements uttered out of court. It protects against extrajudicial physical and moral forces, applied where the privilege has no effect, and which take away the speaker's will and make his words another's, not his own. It excludes evidence so squeezed out because it has no value as proof.

"The privilege has sanction in the Bill of Rights, and

before that in a long but victorious struggle of the common law. It protects against the force of the court itself. It guards against the ancient abuse of judicial inquisition. Before it judicial power, including contempt, to enforce the usual duty to testify, dissolves. No other violence or duress is needed to bring it into play than the asking of a question. It excludes response regardless of its probative value."

In *Thaniel* v. *Commonwealth*, 132 Va. 795, 810, 811, 111 S. E. 259, there is a dictum which confuses the rule of evidence excluding an involuntary confession with the privilege against self-incrimination. This is based on a quotation from *Bram* v. *United States*, 168 U. S. 532, 542, 18 S. Ct. 183, 42 L. Ed. 568, in which it is said that the two rules have a common historical origin. In 3 Wigmore on Evidence, section 823, p. 250, note 5, Dean Wigmore points out the inaccuracy of this statement and the confusion of the two rules in the *Bram Case.*

In showing that an accused remained silent in the face of an accusation, he is not thereby compelled "to give evidence against himself" within the meaning of section 8 of our Constitution. The accused is not testifying, nor is he compelled thereby to take the stand to refute the accusation. The Commonwealth's witness merely details the behavior or conduct of the accused under the circumstances. No one would seriously contend that the Commonwealth could not show that an accused was seen running from the place where a crime had been committed, and yet in a broad sense in doing so he would be giving evidence against himself.

If the argument of the plaintiff in error here were sound, then no one accused of crime could be compelled to submit to fingerprinting, photographing, or the routine police "line up" for identification, which are everywhere admitted to be proper.

The language of Code, section 4778, relied on by the accused shows that it is not applicable here. That section permits an accused to testify in his own behalf and provides

that by so doing "he shall be deemed to have waived his privilege of not giving evidence against himself, and shall be subject to cross-examination as any other witness." Continuing, the language is: " * * * but his failure to testify shall create no presumption against him, nor be the subject of any comment before the court or jury by the prosecuting attorney."

Clearly, this applies to testimony in court and not to· an extrajudicial statement.

■ Code, section 4781, as amended, prohibits the use against an accused "of any statement made by him as a witness upon a legal examination, unless such statement was made when examined as a witness in his own behalf." This section likewise has no application to . an extrajudicial statement. In *Pflaster* v. *Berryville*, 157 Va. 859, 864, 161 S. E. 58, we held that it did not render inadmissible statements made by the accused to the committing magistrate after the hearing.

But the accused argues that despite the soundness of the general principles to which we have referred, the evidence of his silence should not have been admitted under the peculiar circumstances then existing.

First, it is said that the evidence was inadmissible because at the time the accused was under suspicion and was in custody pending the investigation of the crime, and that under such circumstances he had the right to remain silent without thereby creating any adverse presumption against himself.

The authorities are divided as to the effect upon the admissibility of an incriminating statement made in the presence of an accused, and not denied by him, when he is *under formal arrest* or is *in custody under a criminal charge* at the time the statement was made. Some courts hold that under such circumstances the testimony is inadmissible, while others hold the contrary. See 20 Am. Jur., Evidence, section 574, p. 486; 4 Wigmore on Evidence, 3d Ed., section 1072, pp. 80, 81; Greenleaf on Evidence, 16th Ed., section

197, p. 330; Annotations: 80 A. L. R. 1235, 1259-1267, 115 A. L. R. 1510, 1517-1519; 22 C. J. S., Criminal Law, section 734 (4), pp. 1263, 1264.

Dean Wigmore takes the view that the fact that the accused is at the time under arrest is merely a circumstance to be considered and does not *per se* render such evidence inadmissible. 4 Wigmore on Evidence, 3d Ed., section 1072, pp. 80, 81.

It is not necessary that we now decide which of these lines we will follow, for, as has been said, at the time of the accusatory statement, Owens was not under formal arrest, nor had any charge been lodged against him. He was merely detained at police headquarters pending the completion of the investigation. Not until after he had remained silent, in the face of Vaughan's accusation, was the accused arrested.

In a similar situation, in *Tillman* v. *Commonwealth*, *supra*, we held such evidence admissible. We adhere to that holding.

Next, it is argued that since Owens had once denied any knowledge of the theft he was not called upon to make a second denial.

But the circumstances surrounding the two incidents were entirely dissimilar. At the time of the denial he was not confronted by the statement of the accomplice. But when Vaughan directly accused Owens of complicity in the theft, a reiteration of the denial was called for if it was to be relied on, or, at least, the jury had the right to take that view. Silence in the latter instance spoke louder than if the defendant had remained silent on the first occasion.

We are of opinion then, that the trial court committed no error in admitting the testimony complained of. It was a circumstance to be weighed by the jury along with the other circumstances in determining the guilt of the accused.

Over the objection of the accused the court at the request of the attorney for the Commonwealth granted Instruction No. 7, as follows:

"The court instructs the jury that the burden of proof is upon the Commonwealth to prove the guilt of accused beyond a reasonable doubt.

"The court further instructs the jury that proof beyond a reasonable doubt does not mean proof to absolute certainty, or beyond all possibility of mistake. A doubt, to be reasonable, must be based on evidence, or lack of evidence, and must be a doubt of a material fact or facts and *a doubt which one should be able to give a good and substantial reason therefor.*

"The court instructs the jury that if, after having carefully and impartially heard and weighed all of the evidence, you reach the conclusion that the defendant is guilty with such degree of certainty that you would act upon the faith of it in your own most important and critical affairs, then the evidence is sufficient to warrant a verdict of guilty." (Italics supplied.)

The courts are hopelessly divided on the subject of the propriety of the use of the italicized language in defining reasonable doubt. See 53 Am. Jur., Trial, section 754, pp. 564, 565; 23 C. J. S., Criminal Law, section 1280, p. 849; Annotations: 16 L. R. A., N. S., 260; 11 Ann. Cas. 1019. See also, 36 Words and Phrases, Perm. Ed., 312-316, under the title, "Reasonable Doubt,—Doubt for which reasons could be given," collecting numerous cases on the subject.

Some of the courts take the view that the use of such language is erroneous and constitutes reversible error. For strong expressions of this view see *Pettine* v. *Territory of New Mexico,* C. C. A. 8, 119. C. C. A. 581, 201 F. 489, 495-497; *Siberry* v. *State,* 133 Ind. 677, 33 N. E. 681, 684. Other cases in this category are *Abbott* v. *Territory,* 20 Okla. 119, 94 P. 179, 181, 16 L. R. A., N. S., 260, 129 Am. St. Rep. 818; *State* v. *Cohen,* 108 Iowa 208, 78 N. W. 857, 858, 75 Am. St. Rep. 213; *Commonwealth* v. *Custer,* 145 Pa. Super, 535, 21 A. (2d) 524, 525; *State* v. *Rosenberg,* 97 N. J. L. (12 Gumm.) 430, 118 A. 207, 208.

Other courts hold that the use of such language is proper.

Among these are *State* v. *Sheppard*, 49 W. Va. 582, 39 S. E. 676, 687, 688; *State* v. *Dillard*, 59 W. Va. 197, 53 S. E. 117, 119, 120; *People* v. *Guidici*, 100 N. Y. 503, 3 N. E. 493, 495; *United States* v. *Woods*, C. C. A. 2, 66 F. (2d) 262, 265; *Griggs* v. *United States*, C. C. A. 9, 85 C. C. A. 596, 158 F. 572, 577, 578.

In a third class of cases, while the language is disapproved, its use is held not to have constituted ground for a reversal. *State* v. *Morey*, 25 Ore. 241, 35 P. 655, 36 P. 573, 577, 578; *State* v. *Newman*, 93 Minn. 393, 101 N. W. 499; *Klyce* v. *State*, 78 Miss. 450, 28 So. 827.

The precise matter does not seem to have been previously presented to this court, but we are impressed with the reasoning of the authorities which hold that the use of the language constitutes reversible error.

The phraseology does not tell the jury merely that a doubt to be reasonable "must be serious and substantial," which is the language usually employed. It goes beyond this. It says that the doubt must be one for which a person "should be able to give a good and substantial reason."

The language employed is susceptible of the interpretation that a juror must be able to formulate or express in words the reason for the doubt which may be in his mind before it can be classed as reasonable. A juror may entertain a reasonable doubt as to the guilt of the accused although he may be unable to formulate or express it in words. He may be unconvinced by the evidence and yet unable "to give a *good and substantial* reason," or, indeed, to express any reason for the result of his mental process. If such doubt be honestly entertained the juror should vote for acquittal.

Again, who is to decide whether the doubt which may perplex the mind of a juror is a "good and substantial" one? Is it to be the individual juror himself or his fellow jurors?

As is said in *Pettine* v. *Territory of New Mexico*, *supra* (201 F., at pages 496, 497): "If no juror who has a doubt of the guilt of the accused may lawfully vote for his ac-

quittal unless he can give a sound reason for his doubt based on the evidence or the want of it, the question immediately arises whether this reason must be sound in his own opinion only, or in the opinion of his fellow jurors, or of the judge, and, once adopt this rule and instructions on this subject must inevitably multiply and add dialectics and confusion to the rule and its application. The ability to give sound reasons for their doubts or their beliefs is not given to many men, and every prudent and thoughtful man at once recognizes the fact that in the graver and more important affairs of his own life doubts for which he can formulate no convincing reason often induce him to act or to refuse to act. To require every person accused of crime to present such a state of evidence at his trial that every juror can give a sound reason based on the testimony for his doubt of his guilt before he may vote for his acquittal places too heavy a burden on the accused. It destroys the rule of reasonable doubt, and substitutes for a reasonable doubt a demonstrable doubt logically and conclusively sustained by the evidence or the want of it."

In *Siberry* v. *State, supra* (33 N. E., at page 684), this is said: "We have a doubt in relation to things about which we can give no reason, and of which we have imperfect knowledge. It is the want of sufficient knowledge in relation to the facts constituting the guilt of the accused that causes the juror to doubt. It is the want of information and knowledge that creates the doubt."

In the dissenting opinion it is argued that under the evidence the accused is plainly guilty, that the objection to the language complained of in the instruction is highly technical, and that the error, if any, is harmless.

The evidence of the Commonwealth, as we have said, does show the guilt of the accused beyond a reasonable doubt, but that adduced by the accused, had it been accepted by the jury, would have warranted his acquittal. It was for the jury, and is not for this court, to say which view should have been accepted.

The wealth of judicial writing on the subject, and the view taken by many of the highest courts, refute the suggestion that the objection by the accused to the language complained of is captious or hypercritical. The language incorporated into the definition of reasonable doubt what the majority of the court deems to be an incorrect principle of law. Hence, the error is of serious consequence.

We have many times said that errors of this character are presumed to be prejudicial and cannot be brushed aside as harmless.

Error is assigned to the action of the lower court in refusing to grant Instruction R-5, which reads thus:

"The court instructs the jury that testimony of the previous good character of the accused is substantive evidence in his favor, to be considered by the jury along with all the other evidence in the case, and if the jury believe from this testimony that the accused has a previous good character, this fact may be sufficient to create a reasonable doubt as to his guilt or innocence of the charges of which he is now on trial and thus requires the jury to find him not guilty."

The instruction as asked for was properly refused. We have several times disapproved the phraseology of that portion of the instruction which would have told the jury that evidence of the previous good character of the accused "may be sufficient to create a reasonable doubt as to his guilt or innocence." *Briggs* v. *Commonwealth*, 82 Va. 554, 563; *Troutner* v. *Commonwealth*, 135 Va. 750, 755, 756, 115 S. E. 693; *Mitchell* v. *Commonwealth*, 141 Va. 541, 563, 564, 127 S. E. 368.

At the request of the accused the court granted Instruction D-3, which told the jury that: "The character of a prisoner when proven, whether good or bad, is a fact to be considered by the jury, but its weight as affecting the guilt or innocence of a prisoner is a matter for the determination of the jury in connection with the other facts proven in the case."

In *Crump* v. *Commonwealth*, 98 Va. 833, 835, 23 S. E. 760, this instruction was approved. It was there said that it "wholly covered" the subject "and was so expressed as to prevent the jury from being misled." This holding was approved in the later case of *Mitchell* v. *Commonwealth, supra* (141 Va., at page 564.)

We have considered the remaining assignments of error and deem them to be without merit. They involve no principles which warrant the extension of this opinion.

For the error of the lower court in granting Instruction No. 7, defining reasonable doubt, the verdict of the jury is set aside, the judgment is reversed and the case remanded for a new trial.

*Reversed and remanded.*

SPRATLEY, J., dissenting:

I am in accord with the excellent opinion written by Mr. Justice Eggleston in this case, save as to the conclusion that the trial court erred in giving instruction No. 7. The opinion is so forceful and strong in every other respect, that I hesitate to dissent in any particular. However, considering all of the circumstances of the case and the precise nature and character of the instructions as a whole, I feel bound to state my reasons for arriving at a contrary view as to the effect of the above instruction.

In close cases when the evidence is in sharp conflict and there is substantial support for opposing views, we have often held that any error is prejudicial.

On the other hand, where it clearly appears that the error did not affect the merits of the case, nor prejudice the party appealing, we have adopted and applied the doctrine of harmless error.

We are not here dealing with a "borderline" or close case. Here the evidence fully, clearly, and satisfactorily discloses a flagrant and deliberate violation of a law as old as the Ten Commandments. Mr. Justice Eggleston says,

and the majority of the court agrees with him, that the evidence is amply sufficient to show the guilt of the defendant beyond a reasonable doubt. When a defendant has had a fair and impartial trial that is all that ought to be necessary to sustain his conviction.

We have often said that when the circumstances proved are of such a character as to warrant a verdict of guilt, neither courts nor juries should be alert to discover technical or imaginary loopholes through which the guilty can escape punishment. The object of courts is to shield the innocent and punish the guilty.

The courts have found it difficult to define reasonable doubt. Whenever attempted, criticism is invited. It is hard to observe nice legal distinctions, and it is not difficult to make hypercritical objections.

The precise question involved has never before been presented to us; but we have stated the rules for its determination. In passing upon objections to an instruction defining reasonable doubt, including an objection that the burden of raising a doubt was improperly put upon the defendant, Keith, P., in *McCue* v. *Commonwealth*, 103 Va. 870, 1001, 49 S. E. 623, said:

"A careful perusal of the instructions satisfies us that they fairly submitted to the jury the principles of law by which they should be governed in the consideration of the evidence. It would be impossible to prepare instructions to which an ingenious critic might not present plausible objection. The definition of 'reasonable doubt' is attempted by the court. It is a difficult, if not impossible, task so to define it as to satisfy a subtle and metaphysical mind bent upon the detection of some point, however attenuated, upon which to hang a criticism. But no unbiased person can read those instructions without having the conviction forced upon him that every safeguard which the benignity of the law throws around a prisoner upon trial was accorded to the petitioner in this case."

In *Sims* v. *Commonwealth*, 134 Va. 736, 754, 115 S. E. 382, Judge Burks said:

"Instructions ought to be read as a whole and when the above mentioned instruction is read in connection with instruction six, it is difficult to understand how the jury could have had any doubt on the subject. The prisoner never has to prove any fact beyond a reasonable doubt or by a preponderence of the evidence. All he has to prove in any case is such a state of facts as will raise a reasonable doubt in the minds of the jury as to the existence of the fact or facts sought to be established by the Commonwealth, and this was sufficiently stated in instruction six. If counsel for the prisoner had any doubt on this subject, all he had to do was to ask the court for a fuller or more particular statement as given above, and it would doubtless have been accorded him. In the absence of such a request the instruction itself is an adequate statement of the law for the guidance of the jury."

There is nothing in the record before us to indicate that it was argued before the jury that a juror must be able to formulate, or express in words, his reason for any doubt of the guilt of the defendant. The defendant was represented by able, learned, and experienced counsel. If he had deemed a further explanation of the definition of the instruction necessary, all he had to do was to ask the trial court for a fuller or more particular statement. If it had been argued that the definition required the jurors to express in words the reason for their doubt, objection doubtless would have been promptly made and sustained by the trial court. It is obvious from the verdict that counsel for the defendant was unable to point out any fact or facts to the jury justifying a doubt of guilt. In the absence of the named circumstances, the ingenious argument of counsel is further attenuated in refining the word "give" too far. The majority in following him has placed too much emphasis on that one word. The definition of this word requires a full column in Webster's New International Dictionary, (Second Edition) Unabridged. As here used, it should be given its ordinary and commonly accepted meaning.

The words "a doubt which one should be able to give a good and substantial reason therefor," should be read and considered not only in connection with the paragraph in which they appear, but in connection with the entire instruction and the other instructions given. The language distinguishes a doubt which would avail the defendant from a merely vague and imaginary doubt. It is a statement bearing a distinct relation with every other principle stated in the instruction, principles which have been repeatedly approved by this court.

The phrase "reasonable doubt" means a doubt for which some standard of reason can be assigned or given. It has been frequently said that it is its own best definition.

It is assumed that jurors are men of at least fair and average intelligence. A doubt for which a reason cannot be given can hardly be considered a reasonable doubt. Certainly it is not substantial. If doubt exists, there must be some basis for it. The basis may be the nature or quality of the evidence, or lack of evidence. Want of sufficient knowledge in relation to the facts necessary to show the guilt of the defendant may raise a doubt. Such basis for doubt and such want of knowledge readily suggest a reason which may be given by a juror.

Instruction No. 7 read as a whole, and read with the other instructions, told the jurors in the clearest language that the burden of proof rested upon the Commonwealth to prove the guilt of the defendant beyond a reasonable doubt. The duty of the Commonwealth was kept prominently before the jury throughout the instructions. The instructions put no burden on the defendant. They did not require him to prove anything. They required the Commonwealth to satisfy the jury of defendant's guilt to such an extent as to leave their minds free from any reasonable doubt of defendant's guilt. The jurors were expressly told that a reasonable doubt could be "based on evidence or lack of evidence," provided it was "a doubt of a material fact or facts."

Furthermore, the presumption of innocence which attends a defendant throughout his trial was kept prominently before the jury.

In instruction D-1, the jury were told:

"The Court instructs the jury that the law presumes the accused to be innocent of the offense with which he is charged, unless and until he is proven guilty by the Commonwealth by evidence beyond all reasonable doubt and to the exclusion of every reasonable theory or hypothesis consistent with his innocence. This presumption of innocence goes with the accused throughout the whole case and applies at every stage thereof, and is sufficient to require you to acquit the accused until it is overcome by evidence introduced by the Commonwealth which is so strong as to leave no reasonable doubt in your minds as to the guilt of the accused. Even though you may have a suspicion that the accused is guilty, or even if you may think that there is a probability that the accused is guilty, or even though you may believe that the greater weight or preponderence of the evidence is against him, that is not sufficient to justify conviction, or if there is any reasonable doubt as to any fact or element necessary to establish the guilt of the accused, the law makes it your duty to acquit him. The law places upon the Commonwealth the burden of proving beyond all reasonable doubt every essential element necessary to constitute the crime so clearly that there is no reasonable theory consistent with the evidence upon which he could be innocent, and unless the jury have an abiding conviction of the guilt of the accused, you must find him not guilty."

It seems to me that the view adopted in West Virginia (*State* v. *Sheppard*, 49 W. Va. 582, 39 S. E. 676; *State v. Dillard*, 59 W. Va. 197, 53 S. E. 117), in New York (*People* v. *Guidici*, 100 N. Y. 503, 3 N. E. 493), and in numerous Federal cases, (*United States* v. *Butler*, 1 Hughes 457, Fed. Cas. No. 14700; *Griggs* v. *United States*, 158 F. 572), is in harmony with sound reasoning and logic, and promotive of the administration of justice.

The instructions which emphasized the presumption of innocence which attended the defendant through the trial, and stressed the burden resting upon the Commonwealth to prove his guilt beyond a reasonable doubt negative the contention of the defendant that any burden of proof was put on him. Instruction No. 7 constituted only harmless error at most.

As has been stated, the question involved is new. A mere disapproval of the language used, because of the possibility of a misinterpretation under certain circumstances, should give sufficient warning to the trial courts in the future.

We approve the verdict of a jury upheld by credible evidence. It seems clear, at least to me, that the jury, in this case, could not have been misled by instruction No. 7. We are all agreed that there was no ground for reasonable doubt; hence there was no necessity for a juror to undertake to give a reason therefor. The possibility suggested by the contention of the defendant was thus removed.

The defendant has had one fair trial, and he is entitled to no more. To set aside the judgment in this case offers full opportunity for evidence and witnesses to become lost, and facts to become obscure by reason of defective memory. Thus, the convicted defendant will have brought to his aid a delayed and postponed trial, an agency often relied on to defeat justice.

Aware of the futility of a dissent to the principle stated by the majority, I still must register my disagreement with the conclusion of my learned associates, because the facts of the case do not warrant the application of the principle adopted.