COURT OF APPEALS OF VIRGINIA


Present:  Judges Coleman, Annunziata and Bumgardner
Argued at Norfolk, Virginia


REGINA LEA FRANK

                                    MEMORANDUM OPINION[*] BY
v.    Record No. 0824-98-1         JUDGE SAM W. COLEMAN III
                                         MAY 25, 1999
COMMONWEALTH OF VIRGINIA


             FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
                    Junius P. Fulton, III, Judge

             Lenita J. Ellis for appellant.

             Marla Graff Decker, Assistant Attorney
             General (Mark L. Earley, Attorney General;
             Richard B. Smith, Assistant Attorney
             General, on brief), for appellee.


     Regina Lea Frank was convicted by bench trial of

second-degree murder for the death of her two-month-old son,

Zachary Frank.  On appeal, Frank contends that the trial court

erred in denying a motion to suppress her oral and written

statements and that the evidence was insufficient to support the

conviction.  Finding no error, we affirm.

                        I.  BACKGROUND

     When an appeal challenges the sufficiency of the evidence or

the denial of a suppression motion, we view the facts in the light

most favorable to the prevailing party and grant to that party all

_____

     *Pursuant to Code § 17.1-413, recodifying Code § 17-116.010,
this opinion is not designated for publication.

reasonable inferences fairly deducible therefrom.  See Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975) (regarding sufficiency appeals); Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991) (regarding suppression motion appeals).

On Monday, November 25, 1996, two-month-old Zachary Frank stopped breathing in his father's arms.  Mr. Frank attempted CPR while awaiting assistance.  When paramedics responded, they found the baby unconscious and having agonal respirations of eight per minute.  Paramedics attempted to intubate the child twice but failed.  They noted that the airway was clear and then ventilated the baby with a bag valve mask.  The baby responded and began to cry after which paramedics administered "blow by" oxygen.  Zachary's breathing returned to the normal range of about sixty breaths per minutes.  The baby's eyes were deviated, and he was posturing, or arching his back.  When they arrived at the King's Daughters Hospital, at 6:03 p.m., the baby's color was restored, and he continued to breathe on his own.  At the hospital, doctors administered meningitis antibiotics in accordance with hospital policy.

At trial, the Commonwealth called three medical expert witnesses who described the baby's medical condition and opined that the cause of death was shaken baby syndrome.

Dr. Christopher Foley, a pediatric intensive care physician, treated Zachary for most of the baby's time at the hospital.  He

-

first examined Zachary between 9:30 and 10:00 p.m. the night he arrived.  Dr. Foley testified that Zachary was critically ill, pale and mottled, had low blood pressure, was on heart medication and was on life support.  A CT scan of Zachary's head on November 25, revealed subdural and subarachnoid hemorrhages,[1] and loss of gray-white differentiation, indicating swelling of the brain.  Upon further examination, Dr. Foley also discovered retinal hemorrhaging.

Doctors administered an EEG which indicated that Zachary's brain had "suffered a global insult" that affected the vast majority of his brain.  Despite administering phenobarbital medication, the child continued to experience seizures causing further injury to the brain.  Zachary had signs and symptoms of brain death thirty-six to forty hours after arrival at the hospital.  Ultimately doctors performed a "flow study" on Zachary's brain revealing that the brain was receiving no blood flow, and he was clinically dead.  On December 1, at 1:00 p.m., doctors pronounced him dead.

Dr. Donald Lewis, a pediatric neurologist at the King's Daughters Hospital, assisted as a consultant for Zachary on the morning of November 26.  Dr. Kinnison, an Assistant Chief Medical Examiner for the Commonwealth, performed an autopsy on Zachary.

---

[1]Dr. Foley testified that subdural hemorrhaging refers to blood beneath the thick dura of the brain whereas subarachnoid hemorrhaging refers to blood directly against the brain.

-

All three experts opined that Zachary's cause of death was shaken baby syndrome. Each acknowledged that establishing the time of injury was imprecise, but each testified that the injuries could have occurred seventy-two hours before the CT scan.[2]

In addition to establishing that Zachary's constellation of injuries was consistent with shaken baby syndrome, the experts also ruled out numerous other possibilities. The experts testified that neither aggressive CPR, lack of oxygen, meningitis, meningitis prophylactics, antibiotics, reflux, reflux medication, apnea, failed intubation attempts, phenobarbital, nor the cryprecipitate blood transfusions or any combination of these events would have caused the combination of symptoms that afflicted Zachary. According to Dr. Lewis, "there is no other explanation [than shaken baby syndrome] that causes this constellation of injuries."

Prior to the incident, Zachary had been treated for reflux. Additionally, on Saturday, November 23, 1996, doctors at King's

---

[2]Dr. Foley testified that the CT scan showed the presence of old and new blood indicating two separate injuries, one of which would have occurred within approximately seventy-two hours and one of which would have occurred four or five days earlier. Lewis testified that the injuries would have occurred within twenty-four to seventy-two hours. Kinnison stated that the symptoms could appear anywhere from immediately after the injury to seventy-two hours after the injury. She also stated that injuries sometimes occur three, four, or even five days before the symptoms appear. All the witnesses agreed that a shaken baby sometimes shows no apparent signs of injury for three or more days.

-

Daughters' outpatient clinic diagnosed Zachary with a viral infection but did not notice anything else unusual and did not prescribe any medication. Family members testified that on November 24 and 25, Zachary had cold symptoms but otherwise appeared normal.

Police Investigator Ingram first spoke to the defendant at the hospital on November 26, the day after Zachary's admission to the hospital. Mrs. Frank had left the hospital and had slept for about four hours that evening, which she testified was about her normal amount of sleep.

At Ingram's request, the Franks met with him at the police station at 3:12 p.m. on November 26. Ingram, Investigator Goldberg, and Child Protective Services worker Brent Ramey were present. Prior to interviewing Mrs. Frank, Ingram advised her of her rights. Mrs. Frank executed a Norfolk Police Department Legal Rights Advice Form PD-381. She was not restrained and did not appear intoxicated or under the influence of drugs. During the course of the interviews, the officers neither threatened Mrs. Frank, raised their voices, nor made any promises.

Initially, Mrs. Frank denied injuring her child and suggested that her daughter may have inflicted the injury. At 5:07 p.m., officers decided to interview Mr. Frank. Officers asked Mrs. Frank if she wanted to use the bathroom or if she needed a drink. After interviewing Mr. Frank, the investigators brought Mrs. Frank back into the interview room where she agreed to take a polygraph

-

test.  At 6:50 p.m., prior to the polygraph, Regina Frank stated "If I did it, I don't remember doing it."  At 7:13 p.m., she stated, without prompting, "How can you tell if I did it if I don't remember doing it."  At 7:15 p.m., in reference to Friday evening, Frank stated

> I was in a good mood all weekend but I was frustrated that I couldn't help Zachary and that he was sick.  My older daughter frustrated me by asking me if she could watch the same movie over and over again.  I gave in and let her.  Sometimes I raise my voice at my daughter and I almost struck her out of frustration.

At 7:16 p.m., she stated, "I sometimes take out my frustrations by cleaning up the house and throwing things at the wall but not at people."  Investigators Ingram and Goldberg made notes of these statements.

Between 7:19 and 8:20 p.m., Investigator Crank performed a polygraph examination on Mrs. Frank.  After the examination, Ingram informed Mrs. Frank that the test indicated a ninety-nine percent probability of deception.  At 8:34, Mrs. Frank stated: "Both kids were getting me upset and my older daughter wanted to watch the same movie over and over and I shook the swing and probably took him out and shook him.  I lost control so much I can only remember some parts."  Upon departing the polygraph room, investigators offered Mrs. Frank a beverage.

Investigators again advised Mrs. Frank of her legal rights and thereafter obtained an eight minute taped statement.  During

-

the statement, Mrs. Frank admitted to being frustrated at her daughter's behavior and by Zachary's crying. She admitted that on Friday, she shook the swing upon which Zachary sat. Ingram asked, "Didn't you tell me you shook the swing violently?" She responded, "Yes sir." When asked if her husband or anyone else shook the child she responded "No." When asked, "How do you feel that he acquired these injuries," she responded, "By me shaking him."

A stenographer transcribed the tapes and at 11:05 p.m., investigators presented Mrs. Frank with the transcripts to review. She pointed out several errors which Ingram corrected, she added one phrase, and she signed every page. At 11:10 p.m., investigators arrested Mrs. Frank.

Prior to the polygraph, Ingram held a picture of Zachary up close to Mrs. Frank and he said, "Mommy, help me." Ingram also asked Frank if she believed in God and when she responded in the affirmative, he said "well if you didn't do this . . . can you invoke the Lord and tell him to help us find who [did this] and can you look God in the eyes . . . at judgment day . . . and tell him that [you] didn't have anything to do with this." Frank held her hands up in the air with her fists balled, and Ingram said "can't you open your heart . . . . [H]olding your hand in a fist is an indication that your blocking something . . . . [L]et him in, call him out."

-

## II.  ANALYSIS

### A.  SUPPRESSION MOTION

In an appeal challenging a ruling on a motion to suppress, we consider the evidence in the record from both the suppression hearing and the trial.  See Woodson v. Commonwealth, 25 Va. App. 621, 625, 491 S.E.2d 743, 745 (1997).  "While we are bound to review de novo the ultimate questions of law, we 'review findings of historical fact only for clear error.'"  Id. at 625, 491 S.E.2d at 745 (quoting Ornelas v. United States, 517 U.S. 690, 699 (1996)).

Even when a suspect waives his or her Fifth and Sixth Amendment rights, a confession made involuntarily is inadmissible.  See Morris v. Commonwealth, 17 Va. App. 575, 579, 439 S.E.2d 867, 870 (1994).  The voluntariness of a statement is "ultimately a legal rather than a factual question, but subsidiary factual questions are entitled to a presumption of correctness."  Williams v. Commonwealth, 234 Va. 168, 172, 360 S.E.2d 361, 364 (1987).  Therefore, we determine whether the facts, viewed in the light most favorable to the Commonwealth, support the trial court's legal conclusion that Regina Frank gave her statements voluntarily.

Based on the totality of the circumstances, Frank's will was not "overborne," nor was her "'capacity for self-determination critically impaired.'"  Thomas v. Commonwealth, 244 Va. 1, 15-16, 419 S.E.2d 606, 614 (1992) (quoting Gray v. Commonwealth, 233 Va.

-

313, 324, 356 S.E.2d 157, 163 (1987)).  Her statements were the "product of an essentially free and unconstrained choice."  Id.

In examining the totality of circumstances a court must consider a number of factors including age, intelligence, background and experience with the criminal justice system, the purpose and flagrancy of any police misconduct, the length of the interview, and moral and psychological pressures placed on an accused from authorities.  See Morris, 17 Va. App. at 579, 439 S.E.2d at 870.

Frank was twenty-nine years old.  According to her testimony she had completed high school and later earned a nursing assistant certificate.  A psychiatrist called by the defense testified that despite a below average IQ, Frank was competent at the time of the offense and that her memory was intact.  The psychiatrist also testified that Frank showed signs of emotional blunting probably as a result of sexual abuse and chaos surrounding her life especially during puberty.

She had slept for four hours prior to the interrogation -- a normal amount for her -- and she was not under the influence of drugs or alcohol at the time of the interview.  She "agreed willingly to" meet Ingram at the station, and she was not restrained in any way upon arrival.

Ingram advised Frank of her Miranda rights.  Frank executed the advisory form and detectives again advised her of her rights prior to the taped statement.  During the course of the entire

-

interview, Frank never invoked her right to silence or to have an attorney present.  She never appeared confused or emotionally upset.  From the time she arrived at the station house until the time she was arrested, eight hours elapsed.  However, during that time she had numerous breaks, and investigators offered her multiple opportunities to use the restroom or obtain a beverage.  Additionally, Frank made statements that justifiably raised the investigators' suspicions less than four hours after her arrival at the station.

Frank argues that investigators used the polygraph as an instrument of coercion rendering her statements involuntary.  The purpose of requiring that admitted statements be voluntary is to insure that "the admission or confession is trustworthy as testimony."  Owens v. Commonwealth, 186 Va. 689, 700, 43 S.E.2d 895, 900 (1947); see Jones v. Commonwealth, 214 Va. 723, 726, 204 S.E.2d 247, 249 (1974).  Although the results of polygraph examinations are not admissible, we have not applied a similar per se prohibition to statements obtained before or after voluntary polygraph examinations.  See e.g., id. at 727, 204 S.E.2d at 249 ("We do not agree . . . that because polygraph testing is not admissible, any statement by defendant made to the polygraph operator in the pretesting conditioning period, or as a preliminary to the testing, should also be excluded.").  We find that the unreliability and inadmissibility of a polygraph examination as an investigative tool does not render substantive

-

statements per se involuntary. The same standards apply to confessions obtained with the use of a polygraph examination as apply to other confessions. See Jenner v. Smith, 982 F.2d 329, 334 (8th Cir 1993); Bae v. Peters, 950 F.2d 469, 475 (7th Cir. 1991); J. Smith, Admissibility in evidence of confession made by accused in anticipation of, during, or following polygraph examination, 89 A.L.R.3d 230, 233-34 (1979).

Here, Ingram explained to Frank that the results of polygraph tests are generally not admissible in court and that she had a right to refuse the test. Frank agreed to take the test and never stated that she did not wish to do so. Undoubtedly, telling Frank that she "failed" the test had an impact on her willingness to speak, but nothing about its effect on Frank raises a concern about the reliability or voluntariness of her statement. There is simply no evidence that the polygraph exam coerced Frank's statement.

Similarly, the investigators' use of religion as an investigative tool does not render Frank's statement involuntary. See Rodgers v. Commonwealth, 227 Va. 605, 615, 318 S.E.2d 298, 303-04 (1984). We find that based on the totality of the circumstances, including an assessment of Frank's background and psychological condition, and having considered all the investigative tools employed, Frank's statements were voluntary and reliable.

-

Frank also contends that alleged oral and written statements attributed to her were unreliable.  The three individuals present at the interview reported substantially similar statements, and Frank reviewed and corrected her recorded statement.  Furthermore, on appeal, we defer to the fact finder's assessment of the credibility of evidence.  See Schneider v. Commonwealth, 230 Va. 379, 382, 337 S.E.2d 735, 736-37 (1985).  Accordingly, the trial court did not err in admitting and accepting the statements.

B.  SUFFICIENCY OF THE EVIDENCE

1.  Standard of Review

Frank challenges the sufficiency of the evidence to support her conviction.  She contends the evidence was insufficient to show that the cause of Zachary's death was homicide.  Frank claims that even if the cause of death was homicide, there was insufficient evidence to establish that she was the criminal agent.  Finally, she claims that even if she was the cause of death, there was insufficient evidence to establish the element of malice.

As stated earlier, we view the evidence in the light most favorable to the Commonwealth and grant to the Commonwealth all reasonable inferences fairly deducible therefrom.  See Higginbotham, 216 Va. at 352, 218 S.E.2d at 537.  We discard any evidence of the accused in conflict with the Commonwealth's evidence, and we regard all the Commonwealth's credible evidence as true.  See Boblett v. Commonwealth, 10 Va. App. 640, 651, 396

-

S.E.2d 131, 137 (1990). Furthermore, circumstantial evidence is as competent and entitled to as much weight as direct evidence on appeal. See Coleman v. Commonwealth, 226 Va. 31, 53, 307 S.E.2d 864, 876 (1983).

Finally, as the appellant points out, in a wholly circumstantial case, the evidence must exclude every reasonable hypothesis of innocence. However, the Commonwealth need not exclude every possible theory of innocence, rather it must exclude only those which flow reasonably from the facts and raise a reasonable doubt of guilt. See Payne v. Commonwealth, 216 Va. 265, 272, 217 S.E.2d 870, 875 (1975). Whether a particular hypothesis is reasonable, is a question of fact binding on appeal unless plainly wrong. See Lovelace v. Commonwealth, 27 Va. App. 575, 586, 500 S.E.2d 267, 273 (1998).

Moreover, the Commonwealth need not actively negate every reasonable theory of innocence, instead it is sufficient if the evidence as presented has the effect of excluding those theories. See Orange v. Commonwealth, 191 Va. 423, 443, 61 S.E.2d 267, 276 (1950). If, based on the Commonwealth's evidence, the fact finder justifiably could have excluded all reasonable hypotheses of innocence, or determined that any possible hypothesis of innocence was less than reasonable, then we must affirm. We defer to the fact finder because the inferences to be drawn from proven facts are the province of the

-

fact finder so long as they are reasonable and justified. See Higginbotham, 216 Va. at 353, 218 S.E.2d at 537.

When the appellant presents an hypothesis of innocence on appeal, the burden is on the appellant to show that the facts as found by the fact finder do not exclude a reasonable theory that is consistent with the defendant's innocence. See generally Johnson v. Commonwealth, 12 Va. App. 391, 396, 404 S.E.2d 384, 387 (1991) ("The burden is on the party who alleges reversible error to show by the record that reversal is the remedy to which he is entitled."). It is in this context that the Virginia Supreme Court has said that the hypotheses which the Commonwealth must exclude are those that actually flow from the evidence rather than those that merely arise from the imagination of the appellant. See e.g., Black v. Commonwealth, 222 Va. 838, 841, 284 S.E.2d 608, 609 (1981). Thus, to prevail, appellant must show that the facts as established in the record, viewed in the light most favorable to the Commonwealth, do not exclude a reasonable hypothesis that would render the appellant innocent.

## 2. Cause of Death

Drs. Foley, Lewis, and Kinnison each testified that Zachary Frank exhibited the unique constellation of physiological conditions indicating shaken baby syndrome. Each doctor further testified that the combination of symptoms combined with the

-

complete absence of external trauma could only be consistent with

shaken baby syndrome which Dr. Lewis described as

> the phenomena that occurs when a baby,
> usually a small child because of the weight
> involved, is vigorously shaken to and from
> in such a fashion that the blood vessels
> which are surrounding the brain are sheered.
> It causes a great deal of bleeding around
> the brain and with sufficient force tears
> the inside lining of the retina of the eye.

Frank argues that the doctors' opinions are unreliable

because they were based on a mistaken understanding of the

history.  However, Frank fails to point out any particular

mistaken understandings and, in any event, the medical experts

based their opinions on the results of direct examinations rather

than on the child's history.

Frank also argues that the Commonwealth failed to exclude all

reasonable hypotheses of innocence.  She suggests that the medical

experts did not rule out other causes of death.  We disagree.  The

evidence of the medial experts in conjunction with Frank's

admission was sufficient to permit the fact finder to exclude

every other hypothesis of death that flows reasonably from the

evidence.  The experts ruled out every hypothesis that Frank

suggested at trial.  On appeal, Frank seems to suggest that while

none of the hypotheses of injury suggested at trial could account

for the constellation of symptoms Zachary exhibited, an

aggregation of these causes could have resulted in the symptoms.

Thus, if the child had meningitis, if the doctors administered too

-

much phenobarbital, and if the emergency personnel or the father subjected the child to overly aggressive CPR, it was possible that similar symptoms could have appeared. However, expert testimony indicated that research only theorized that aggressive CPR could cause retinal hemorrhaging. Additionally, there was no evidence that the child received too much phenobarbital. Finally, Dr. Lewis testified that Zachary was only treated for meningitis as a matter of hospital routine procedure -- when acutely ill children are admitted they are routinely treated for meningitis. Therefore, in view of the aforementioned standards of review, the evidence excluded all hypotheses of death other than shaken baby syndrome.

### 3. Criminal Agency

Frank argues that the evidence was not sufficient to show that she caused the fatal injury. Frank points out that the Commonwealth called no witnesses who had direct knowledge of the three or four hour period after the paramedics delivered Zachary to the hospital and before Dr. Foley's first examination. Frank appears to argue that even if Zachary died from shaken baby syndrome, the evidence does not exclude every reasonable hypothesis of innocence because the Commonwealth has not credibly established the events that transpired during that three or four hour period. We disagree.

Frank admitted that she was the criminal agent. Thus, the evidence proved that she was the criminal agent and this evidence

-

excluded every reasonable hypothesis of innocence. Frank admitted that out of frustration she shook the baby on Friday, November 22, 1996. When asked, Frank also stated that no one else had shaken the baby. The baby was admitted to the hospital on Monday, November 25, 1996 -- roughly seventy-two hours later. All three medical experts testified that it would be normal for symptoms to appear around seventy-two hours after the injury. There is no evidence that supports an hypothesis that a hospital worker, or some unknown agent, caused the shaken baby syndrome injuries during the three or four hour period after Zachary's admission, and conversely, there is ample evidence that Frank was the criminal agent. See e.g., Webber v. Commonwealth, 26 Va. App. 549, 561-65, 496 S.E.2d 83, 88-90 (1998) (finding evidence that the defendant shook and slapped a baby in combination with medical evidence of causation and timing sufficient to convict defendant of second degree murder).

### 4. Malice

Finally, Frank argues that even if the trial court did not err by finding that Frank caused the injury and death, there was insufficient evidence for the trial court to find malice, and, therefore, the Commonwealth did not sustain its burden of proving second degree murder.

To convict Frank of second degree murder, the Commonwealth had to prove malice aforethought. See Perricllia v. Commonwealth, 229 Va. 85, 91, 326 S.E.2d 679, 683 (1985). Whether Frank acted

-

with malice is a question for the fact finder.  See Essex v.

Commonwealth, 228 Va. 273, 280, 322 S.E.2d 216, 220 (1984).

Malice may be implied from conduct, for example, when a purposeful

and cruel act is committed against another without any or with

only slight provocation.  See Pugh v. Commonwealth, 223 Va. 663,

668, 292 S.E.2d 339, 341 (1982).  Frank cites language in Essex

for the proposition that when an act is committed out of

negligence, malice may not be implied.  See Essex, 228 Va. at 280,

322 S.E.2d at 220.

> [A] common theme running through
> [definitions of malice] is a requirement
> that a wrongful act be done willfully or
> purposefully.  This requirement of
> volitional action is inconsistent with
> inadvertence.  Thus if a killing results
> from negligence, however gross or culpable,
> and the killing is contrary to the
> defendant's intention, malice cannot be
> implied.

Id. (internal quotation marks and citations omitted).  Here,

however, the evidence shows that Frank willfully and

deliberately shook Zachary Frank.

"Implied malice may be inferred from conduct likely to

cause death or great bodily harm, willfully or purposefully

undertaken."  See Canipe v. Commonwealth, 25 Va. App. 629, 642,

491 S.E.2d 747, 753 (1997) (quotation marks and citation

omitted).  Moreover, the fact finder may infer that a person

intends the natural and probable consequences of his actions.

See Campbell v. Commonwealth, 12 Va. App. 476, 484, 405 S.E.2d

-

1, 4 (1991) (en banc).  Additionally, "the comparative weaknesses of the victim and the strength of the aggressor may be considered" in determining the probable consequences of an aggressor's acts.  Id. at 485, 405 S.E.2d at 5.

Experts testified that the injury that Frank inflicted required Zachary's head to go violently forward and backward and that the only comparable injury they encounter occurs when children are thrown from motor vehicle accidents.  Because of the extreme violence required to cause the injury, and because Frank admitted that she willfully and violently shook the baby, the trial court was entitled to infer malice.

### III.  CONCLUSION

We find that based on the totality of the circumstances surrounding the interrogation, Mrs. Frank's will was not overborne, nor was her capacity for self-determination critically impaired.  Therefore, the trial court did not err in refusing to suppress her statements.  Additionally, we find that the Commonwealth produced sufficient evidence to establish that Zachary Frank died of shaken baby syndrome and that it was Mrs. Frank's conduct that caused the fatal injuries.  Finally, we find that the trial court did not err in inferring implied malice from Mrs. Frank's willful and violent shaking of the infant.  Accordingly, we affirm the trial court's decision.

Affirmed.

-